[Crim. No. 22647. Feb. 16, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
GARY LEE HOWARD, SR., Defendant and Appellant.

**COUNSEL**

Jo Anne Keller, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Jay M. Bloom, John W. Carney and Peter Quon, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

LUCAS, C. J.—Defendant Gary Lee Howard, Sr., was found guilty of murder in the first degree. (Pen. Code, § 187; all further statutory references are to this code unless otherwise indicated.) The jury also found that defendant used a firearm during the commission of the offense (§ 12022.5), and that he intentionally committed murder for financial gain, a special circumstance as set forth in section 190.2, subdivision (a)(1). Following a penalty phase trial the jury fixed the penalty at death. Defendant's motion for new trial was denied as was his motion for modification of the sentence. This automatic appeal followed. We will affirm.

## I. FACTS

1. *Guilt Phase*

On the afternoon of May 30, 1981, the body of Walter Berkey was found in a deserted dairy barn near Interstate 10 in Redlands, California. The victim was a 19-year-old junior college student who lived with his parents. Berkey had been shot seven times, once in the back of his left calf, once in the back, once in the left cheek, and four times in the back of his head. Death had occurred at least eight hours before discovery of the body.

Richard "Tony" Lemock was in the sign-posting business in the Redlands area. Lemock met Berkey in the course of doing business because the two were in competition for customers and had argued concerning territorial rights. Both performed a service for realtors, building and erecting any signs that they needed. Starting in early 1981, Lemock made comments to several people indicating his displeasure with Berkey's competition and his desire to "deal" with Berkey because he could no longer handle the situation. At various times, in statements that will be described in greater detail when their admissibility is discussed, Lemock told friends and employees that he would like to have Berkey killed or in some manner scared away. In February or March 1981, Lemock asked a friend, Diane Jensma, to call Redlands police to report that Berkey had narcotics in his car. She made the call but was told to contact the department later when someone could handle the matter, and did not follow up. Around the same time, Lemock asked Barbara Chapman, a former girlfriend, to call police and inform them

that "some guy" had offered her son narcotics on his way to school. Defendant supplied her with a description and license number for the car, and an address which Chapman knew related to the "kid in Redlands" with whom Lemock was having business difficulties. In Lemock's presence, Chapman simulated a call to the police in order to avoid arguing with Lemock.

Joy Stevens was both Lemock's "stepdaughter" and his former daughter-in-law. (Her mother, Barbara Chapman, lived with Lemock for seven years; after their breakup Stevens married the son of Lemock's next wife.) Stevens met defendant in February or March 1981 and became his girlfriend, although she knew he was married. In early May, she introduced defendant to Lemock and the two men went for a ride together. Thereafter, defendant told Stevens that Lemock had asked about the price for having someone roughed up. The next day, on defendant's instruction, Stevens told Lemock that the price was $2,500 but, if necessary, $1,500 would be sufficient.

About one week later, Stevens saw defendant with a revolver. Defendant explained he had purchased it in Palm Springs and told her to avoid touching it to prevent fingerprints.

On May 18, Lemock wrote a $750 check to Stevens for "signposts and stuff" and asked her to cash it. The two went to the bank to do so, and Lemock gave Stevens the money in an envelope and asked her to hold on to it. When, later that day, defendant asked Stevens if Lemock had left him anything, Stevens handed him the envelope. Defendant returned the money to Stevens, also telling her to hold on to it.

Later that evening, defendant and Stevens drove to the Holiday Inn together in defendant's distinctive Ram Charger. Taking the money, defendant left the vehicle, entered the inn and returned 30 minutes later. Defendant explained that he had just hired Jeff to rough up someone for Lemock and told Stevens that Jeff had said "well now, just watch the papers." He described Jeff as a "colored guy" who was a hired killer and identified a Black man leaving the inn as Jeff.

The next day, defendant told Stevens that Lemock would pay one-half of the $1,500 before and one-half after the "roughing up" of Lemock's competitor had occurred. About a week later, Lemock telephoned Stevens to ask her to tell defendant that if it was not done by that weekend he should forget it, Lemock would do it himself. Later that day Stevens told defendant of Lemock's message and defendant replied "Okay." He also informed Stevens that if Jeff did not do it, he would have to do it himself because Lemock would not know how to cover his tracks.

On May 27, 1981, Walter Berkey drove to San Diego with friends for a visit. While he was away, a man, identifying himself as "Roger Meeker,"[1] called to say he had some work for Berkey in Palm Springs. The man spoke with Berkey's sister and also left a message on the victim's answering machine. Stevens saw defendant use her telephone repeatedly. He told her he was attempting to find one of Lemock's competitors to discuss his charges for services. The number used for Berkey's sign-posting business was called from Stevens's home over 15 times between May 27 and May 29.

On May 29, Berkey returned home. "Meeker" called him again and arranged to meet at Sandy's Restaurant in Redlands the next morning at 8 a.m. That morning, defendant, his son Gary, Jr., and Stevens had looked for Jeff at a Redlands motel. When they arrived, defendant stated room 25 was Jeff's former room and that Jeff had gone to Las Vegas but would be in touch. Evidence at trial showed that no one named Jeff or having any connection with the case had stayed in that room at the relevant time. After leaving the motel, the three drove along the route that was ultimately taken with the victim in the car. Defendant checked the mileage as they drove.

That night, Stevens, at defendant's suggestion, asked her mother to baby-sit so the couple could rise early the next morning to "take care of business." About 6:45 a.m., Stevens, Gary, Jr., and defendant drove to Sandy's Restaurant in defendant's Ram Charger. They looked for a small white station wagon and one appeared about a half hour later. Defendant sent his son in to find the driver. He returned, unsuccessful, and defendant sent Stevens to call Lemock and ask what Berkey looked like. Lemock asked why, and Stevens replied she did not know. Lemock gave a description and asked Stevens to come to his shop when she left the restaurant.

Stevens then saw Berkey, and upon identifying him told him that she and her "husband" would wait out back in a truck. Berkey emerged a few minutes later and was met by defendant; the two then left in Berkey's station wagon. Fifteen minutes later, Gary, Jr., and Stevens left Sandy's and drove to California Street. They saw defendant standing on the road near a barn and picked him up and drove away.

As they drove to Lemock's shop, Stevens saw defendant remove from his person a wallet and checkbook of the kind later identified as used by Berkey. Defendant told Stevens not to touch the items to avoid getting her fingerprints on them. She also saw defendant place empty "bullet jackets" into his pocket.

---

[1] The evidence indicated that defendant used the "Meeker" alias in his dealings with the victim. A piece of paper with the name "Roger Meeker" was found in Berkey's pocket.

When the group arrived at Lemock's shop, Gary, Jr., remained in the car as the other two entered. After defendant handed him the checkbook, wallet and empty cartridges, Lemock said "You're for real" and told them to tell him if there was anything he could do for the pair. Defendant asked that, if anything happened to him, Lemock take care of Stevens, her daughter, and their unborn baby.

While this meeting was taking place, Norm Butters, who worked in the building, entered. He asked if defendant and Stevens had just come from Redlands because he had seen the Ram Charger on the freeway. After discussing the car, defendant and Butters went to look at it.

Around that period Lemock asked Stevens if she was aware of what had happened and thought it was his fault or that he was to blame. Lemock also told Stevens that he would help if ever needed and that he was sorry he had gotten defendant involved. Later that day, Lemock called to say Butters had a "push bar" for defendant to look at which he was interested in selling. The group returned to Lemock's business and defendant expressed interest in buying the push bar or grill guard but stated he had no money until the next Monday. Lemock then wrote a check to Butters telling him defendant would pay Lemock back later. At the same time, Stevens heard Lemock say to defendant, "I will go ahead and I will write him a check for $100 now and that will make it $650."

Early in the afternoon of the same day, defendant, his son, and Stevens, with Stevens's daughter, left for Compton in order for defendant to sell the gun he had recently acquired. When Stevens asked whether defendant had seriously hurt Berkey, he replied "Well, let's put it like this. He won't be stealing no more poles." He then explained that while they were in the barn Berkey began "cussing" Lemock. Angered, defendant pulled out his gun and pointed it at Berkey. When Berkey saw the gun he began to run. Defendant shot him in the cheek and Berkey tripped and fell to the ground. Defendant then shot Berkey in the back of the head. Defendant unloaded and reloaded the gun and shot Berkey three more times. In total, defendant told Stevens, he shot Berkey approximately eight times. He had killed Berkey as a favor to Lemock, and defendant told Stevens that if anything were to happen to him she would be convicted along with him as an accessory.

That night, defendant stayed at his mother's house where his wife resided. Gary, Jr., who had run away from Riverside's juvenile hall, stayed with Stevens. The next day the three, accompanied by Lemock and his wife and Stevens's daughter, went on a picnic.

Meanwhile, investigation had begun after the discovery of Berkey's body. Berkey's parents told investigators of a business competitor of their son named Wirtz. The investigators also learned that Kristen Smith had traveled with Berkey to San Diego and had recently written him a check. They eventually found that Wirtz had sold the business to Lemock.

On the morning of June 1, Redlands police officers went to Lemock's shop in San Bernardino. They spoke with Norm Butters asking for Wirtz. Butters informed them that Tony operated the business and showed them the $100 check he had received from Lemock two days before. One of the officers received permission to use the business's restroom and while there saw a $15 check drafted by Kristen Smith payable to Berkey sitting on the counter by the washbasin. Investigation focused on the business and Lemock, who was picked up later that day.[2]

Defendant learned that Lemock was being questioned and with Stevens and his son drove to Fairmont Park in Riverside where he removed the cylinder from the gun and threw the separated pieces of the weapon into the lake. After they returned to Stevens's residence, defendant told Stevens to provide him with an alibi if she was questioned. Thereafter, defendant and his son fled over a fence when they saw a police car approaching. Officers then contacted Stevens, searched her home, and questioned her about the murder. She provided information as directed by defendant and was released. The next day officers seized a .38-caliber bullet from defendant's dresser drawer at his mother's home.

Very early the next day, June 3, defendant called Stevens to meet him in San Bernardino. They met and drove to a nearby motel. Later, they saw officers around defendant's distinctive car in a nearby lot. Stevens then separated from defendant and his son. Later that day, Stevens was again questioned and repeated her story. Investigating officers also impounded defendant's car when their stakeout of the vehicle proved fruitless.

The following afternoon defendant called Lieutenant Nelson to ask why the Redlands Police Department was looking for him. Nelson told him he was wanted for questioning and offered to meet him anywhere. Defendant said he would call back. He also asked about his car and was told it would be released if no ties to the murder were found.

---

[2] Lemock was charged with first degree murder in the same indictment as defendant. Defendant's motion to sever was granted in October 1981, with an agreement that Lemock was to be tried after defendant. After the guilt phase trial in this case, the Lemock indictment was amended to allege as a special circumstance that Lemock intentionally aided defendant in the commission of Berkey's murder for financial gain. (§ 190.2, subd. (b).) Lemock was acquitted after trial.

On June 8, Stevens and her brother, Walter Wilson, met with defendant in the Fontana area. About 11 p.m., after they dropped him off, defendant again called Lieutenant Nelson. This call, unlike the first, was recorded. Defendant described when he had met Stevens and Lemock, and told Nelson that he had given Lemock the number of a Black man named Jeff after Lemock had inquired about hiring someone to rough a guy up. Defendant also told Nelson that he had spent the night before the murder with Stevens and that on the day of the murder he drove with Stevens and his son to Stevens's mother's home in Yucaipa, in a direction different from the site of the murder, and then to Lemock's business. He also stated that Lemock had tried to plant narcotics in his competitor's car. Defendant claimed he had never seen the competitor, but that he had telephoned him twice, once leaving a message on a recording machine. Defendant denied ever receiving any money from Lemock.

On June 9, defendant called Nelson again and repeated the information he had provided in the June 8 call. He denied using the name "Roger Meeker" and any involvement in Berkey's murder. A trace was placed on the call and defendant was arrested in a telephone booth in Fontana.

Following his arrest, defendant was questioned by Nelson and Officer Caronna. During the first part of the interview, defendant essentially repeated the information in the telephone calls. He knew Lemock wanted a competitor "roughed up, talked to, or taken care of," but defendant did not want to get personally involved. He gave Lemock Jeff's[3] number to help out. On the morning of May 30, Lemock asked for a favor and gave defendant a gun to get rid of because it was "hot." Defendant complied by throwing the gun in the Fairmont Park Lake. Lemock had written a check for the grill guard because he owed Stevens money. Defendant suggested that Lemock had done the shooting.

Nelson then told defendant his son had shown police where the trio had parked behind Sandy's Restaurant. Defendant stated that the incident had occurred a few days after the shooting and also denied his son's report that defendant had spoken to someone named "Walter" from Stevens's house. When told that Stevens's brother Walter Wilson had said defendant told him things had gone wrong and the "kid" had fought, forcing defendant to act as he did, defendant denied making the statement.

The initial interview terminated. Approximately two hours later, questioning began again. Confronted with statements made by his son and Stevens in interviews with police, defendant admitted that Lemock had

---

[3] No person named Jeff was ever found or otherwise identified in connection with this case.

offered him $1,500 to kill Berkey. He then described the events on the Saturday of Berkey's death leading up to the arrival at the barn. However, he stated that when he and Berkey entered the barn, Berkey was shot by a third person whom defendant refused to name. He admitted receiving $100 from Lemock for setting Berkey up and for providing the gun used. He asserted that he gave all the items taken from Berkey to Lemock, and Lemock had then given the gun to defendant for disposal.

Thereafter, defendant was placed in county jail on the same tier as Lemock and another inmate named David Kent. As will be described more fully hereafter, defendant made certain statements and requests to Kent, describing the killing and soliciting assistance in killing Stevens and her brother, Walter Wilson.

## 2. *Penalty Phase*

The prosecution presented seven witnesses in the opening phase of the penalty trial. Two were women who had been involved with defendant, two testified regarding the discovery of handcuff keys in defendant's possession while he was in jail awaiting trial, and the last three corroborated or expanded upon the testimony of the two women.

The first woman to testify was Deena Brymer Gibson, who met and began living with defendant in 1972. She described a series of violent acts occurring until Gibson left defendant in 1976. Gibson and her son lived with defendant, and at times with defendant's wife and his mother as well. She testified that her son had bedwetting problems and as punishment defendant made the three-and-a-half-year-old child drink a cup of urine. He also burned the boy between the fingers with a cigarette and beat him on the face and buttocks, causing bleeding. As further punishment for bedwetting, defendant used aerosol hair spray and a lighter as a torch to burn the child's genitals, causing redness and some blistering.

Gibson also related various incidents in which defendant hit her and his wife Linda. She described an incident in which defendant punched his son Gary, Jr., who was then nine or ten, in the stomach and she saw defendant hit his mother, bruising her. According to Gibson, defendant usually carried a gun, and once fired at a car which he believed was trying to force defendant's vehicle off the road. One night, angry at Gibson, defendant beat her up and then held a gun to her head all night threatening to kill her. He also played Russian roulette with her as target.

When Gibson, early in the relationship, tried to leave, defendant's mother called defendant. He came home, caught Gibson, and choked her. A few

months after she left him following the birth of their son, Gibson was shopping with her mother and baby. As she left a store, two teenage boys tried to take the baby. They struggled, and defendant then drove up. Gibson ran back to the store and as she reached the doorway, defendant pushed her, causing her to hit her head on the door requiring stitches.

Despite the above treatment, Gibson returned to defendant to live with her two children and his three sons by his wife Linda Rumsey. Five months later, Linda arranged defendant's absence by a ruse, appeared, and removed her children. Gibson did not resist, but made it appear as if a struggle had occurred. When defendant returned he was enraged and beat and choked Gibson. Soon thereafter, Gibson left defendant permanently.

Linda Rumsey testified she met and married defendant in 1968 in Michigan. Not long after the marriage, defendant became violent with her. At one point, he kept her awake through the night by poking her with a hunting knife because he was displeased with her. When Rumsey left their apartment after a fight, defendant followed, threatening to shoot her. At another time, during an argument, defendant told Rumsey to start running because he would shoot at the count of 10. She complied and saw and heard two or three bullets at her sides kicking up dirt.

Defendant became angry when Rumsey went for a pregnancy examination. Accusing her of going for a "free feel," defendant beat her and kicked her in the stomach. When Rumsey left to return to her family in Michigan in 1969, defendant told her he would rig a bomb to the family car ignition and blow them all up. She returned to California with defendant in 1970, and further abuse occurred. She saw defendant abuse Gary, Jr., and she confirmed that defendant slapped Gibson's son, and testified that she saw defendant force the child to drink urine and saw a burn between the child's fingers. The litany of abuse continued even after Rumsey left, including a 1981 incident in which defendant shot a bullet into the floor of Rumsey's home after he had threatened her.

Two officers testified regarding the discovery of handcuff keys in defendant's possession while in jail awaiting trial in this matter. In one instance, defendant contacted a deputy sheriff to inform him about keys in the possession of another inmate. In addition, defendant also informed authorities of other inmates' escape attempts. A Fontana officer also testified confirming the discovery of a bullet lodged in the floor of Rumsey's residence following the incident Rumsey had described, and a ballistics expert testified that the bullet came from a gun found in a bedroom where defendant had been arrested. An expert stated the gun could not be made to discharge accidentally.

Defendant testified on his own behalf, as did his sister. He explained that in September 1981 while in jail he acted as a witness for the prosecution in the case of "Red" Pensinger, and his cooperation was confirmed in other testimony. He said he was motivated to do so because he did not like people who hurt babies. He also stated he never told David Kent about the killing or asked assistance in killing Stevens. As to the various acts regarding Gibson's son, defendant denied they had occurred. He also denied or had an alternative explanation regarding the attacks on the two women. The bullet in the floor got there after a gun he was cleaning accidentally discharged.

Defendant's sister, Judy Carter, specifically contradicted some of Linda's testimony regarding defendant's abusive conduct. She also stated she had never seen defendant beat a child, that he told her not to use a belt on her children, and that defendant, who is short, tries to compensate by acting "like a big shot."

Defendant and a police officer testified that during an arrest in 1975, only one gun was found with defendant, in contradiction to Rumsey's testimony that he had a cache of weapons. Stevens testified that she never saw defendant hurt her child while they were together between May 1 and May 30. She did see him once with his hands around her daughter's neck, but he was only showing the girl how to shake a kitten.

On rebuttal, a deputy testified that defendant told Rumsey in the hallway after her testimony, "I will get you, bitch." Dr. Robert Flanagan, who had interviewed defendant immediately after his arrest, testified regarding various violent incidents about which he had been told by defendant. Denise Ross, Rumsey's sister, testified she had seen Howard burn the tips of Gary, Jr.'s fingers over a gas flame, and confirmed defendant's threat to Rumsey.

Diana Bracken Leach, who had also lived with defendant, testified regarding various incidents which will be described in more detail hereafter. They included various violent punishments visited upon defendant's children.

On surrebuttal, defendant again denied any violent acts or threats. He denied Dr. Flanagan's statement that he had been thrown out of school for hitting a school principal over the head with a chair in eighth grade. Instead, he stated, he had been kicked out for using marijuana and had hit the principal in the knee with a baseball bat.

Gary, Jr., testified his father had never abused him. He also stated he had had sexual intercourse with Leach in 1980 at her insistence, and denied that

he had ever stated that defendant's sister and her husband had helped him escape from juvenile authorities.

As indicated, after finding defendant guilty of murder in the first degree and the special circumstance to be true, the jury set the penalty at death. We now consider defendant's claims in this automatic appeal.

## II. GUILT PHASE

1. *Admission of Defendant's Confession*

 Defendant asserts that his confession was erroneously admitted because it was involuntary and the product of threats and/or promises by the police interrogators. We disagree.

 The burden is on the prosecution to prove the voluntariness of a confession beyond a reasonable doubt. (*People* v. *Murtishaw* (1981) 29 Cal.3d 733, 753 [175 Cal.Rptr. 738, 631 P.2d 446].) Our role as a reviewing court is " ' "to examine the uncontradicted facts to determine independently whether the trial court's conclusion of voluntariness was properly found . . . . In exercising this function the court recognizes that the burden is on the prosecution to show that a confession was voluntarily given without previous inducement, intimidation or threat . . . ." [Citation.] " (*People* v. *McClary* (1977) 20 Cal.3d 218, 227 [142 Cal.Rptr. 163, 571 P.2d 620].) If there is "conflicting testimony, the court must 'accept that version of events which is most favorable to the People, to the extent that it is supported by the record.' [Citation.]" (*People* v. *Hogan* (1982) 31 Cal.3d 815, 835 [183 Cal.Rptr. 817, 647 P.2d 93].)

 Defendant contends that the police used psychologically coercive techniques in questioning him and impliedly promised that his son, Gary, Jr., and girlfriend, Joy Stevens, would not be charged if defendant confessed freely. These "implied threats" also, according to defendant, "contain the corollary threat that if appellant did not talk, his son and Stevens would be harmed by 'taking the fall' for him." Defendant further claims that he was not fed anything over the course of the evening during which he was questioned. He concedes there were no threats to withhold food or promises to provide food if he confessed, but asserts that his "gnawing hunger," combined with his belief that his son had not been fed, improperly affected his conduct.

Defendant was arrested around 1:30 p.m. on June 9. Approximately 6:10 p.m., he asked to speak with Lieutenant Nelson. Detective Caronna appeared, but defendant declined to speak with him and asked for a lawyer. A

short time later, however, defendant renewed his request to speak with Nelson. An interview with defendant began about 8 p.m., and opened with Nelson confirming that defendant had not been coerced or forced into speaking with him; defendant agreed that the conversation was his "own idea." Nelson then advised defendant of his *Miranda* rights and defendant acknowledged that he understood them and wished to speak with the officer.

Defendant first denied any involvement other than being asked by Lemock to call Berkey with whom Lemock was having problems. Defendant stated he called Berkey twice but never directly spoke with him. He also admitted providing Lemock with the number of "Jeff," a motorcycle gang member who might be willing to "rough up" Berkey. On the morning of the murder he drove with Stevens and his son to Yucaipa to see relatives but they were not in and he drove straight back and then to Lemock's shop. Asked whether he had told another officer the location of the gun used, defendant admitted that he threw it in a lake at Fairmount Park in Riverside County on Saturday night at Lemock's request. He also stated that later on the same day of the killing, Lemock paid $100 to buy an automobile accessory for defendant, although defendant claimed it was because Lemock owed money to Stevens.

After going over defendant's story again, Nelson informed defendant that Gary, Jr., had shown the police where defendant had parked at Sandy's Restaurant. Defendant asserted that had occurred a few days after the murder and also denied his son's statement that defendant had spoken with Berkey.

Nelson thereafter told defendant that he was putting himself "on the point of calling your son a liar." The officer observed that Gary, Jr., was a 16-year-old boy worried about his father and then stated that he, the officer, knew Lemock was involved and they believed defendant was as well. No reference to Gary, Jr.'s possible involvement was made. Nelson also reiterated that he could not make any promises to defendant, and suggested that defendant should, however, be guided by his own integrity and conscience "to square your part of this thing away."

After defendant asserted that he believed Lemock was probably the killer or responsible for the killing, but that he, defendant, was not involved, the officers again laid out the various statements of other persons implicating defendant. Included were statements by his son, Butters, Walter Wilson, and Lemock. Nelson expressed puzzlement about why Gary, Jr., would lie and observed that he believed he was telling the truth because his informa-

tion "checked out." Defendant continued his denials and the interview was terminated at 8:47 p.m.

At 11:05 p.m., the interview recommenced. In the interim, police again interviewed Stevens and Gary, Jr., and others. Defendant was reminded of his rights and confirmed that he wanted to continue to talk. He started out by saying, "I don't want to keep my son involved, because he wasn't involved in nothing." Sergeant Caronna responded, "Okay." Defendant stated, "Joy wasn't involved" and Nelson answered, "Okay. Who was?" Defendant named Lemock, but stated that he did not know who did the shooting although he had obtained the gun for Lemock.

Caronna and Nelson then described to defendant the information they had obtained, essentially outlining the story described in the "FACTS" portion of this opinion with respect to the events of May 30. Caronna then said, "Give it up Gary" and Nelson added, "Joy gave it up. Gary Junior gave it up. Everybody is giving it up except Gary Senior." Defendant expressed disbelief and the officers first played part of a tape of Gary, Jr.'s interview followed by a tape of Stevens's statement. Nelson reminded defendant, "there's a woman involved that you say you love. There's a kid you—you said before you loved," before starting the second tape from Stevens. While recounting her story and answering questions, Stevens was heard crying. After playing parts of the tape, Officer Nelson offered to play other portions and observed, "What do I tell you, Gary, when I have been dealing with you for a week and I think you're, I am dealing with a guy who's a man, he letting [*sic*] this chick and son take a fall." He added soon after "I know you wouldn't want somebody else, especially someone you loved—ride [*sic*] a beef for you." He again asked for Gary to "straighten the things out." Both officers emphasized that Gary, Jr., loved his father, as did Stevens, and it had been hard for him to tell the truth.

After a pause, defendant began talking. He stated Lemock offered him $1,500 to kill the victim, and claimed that Lemock made all the arrangements for Berkey to meet at Sandy's. In the course of going through the day's events, defendant described the activity once he, his son, and Stevens, arrived at the restaurant. After he stated he sent his son in first, and Nelson asked what the boy then told him, defendant asked, "This isn't gonna involve him?" Both officers confirmed it would not, to which defendant responded, "I mean, I don't, I will take the fall, okay." Nelson told him, "We don't want your son, Gary, I mean that, we got kids, Gary. Okay? Gary, it's not gonna involve your boy." He added that the boy had already told them he entered the restaurant, and that "We don't want your boy, Gary. We want the, the main parties in this, that's Tony and you, isn't it?" Nelson added they did not want Stevens either.

Defendant then admitted going to the barn with Berkey, but claimed that Berkey was shot by a third person whom he refused to name. The balance of the interview was largely concerned with the officers' attempts to get defendant to admit he himself did the shooting or to name the person he claimed was the shooter. Defendant refused, asserting at one point that if he told, his family would be in danger. The primary references to defendant's family and to Stevens thereafter were mainly directed at convincing defendant that they would be safer if defendant named the person who had done the shooting. At one point, defendant asked if Stevens would be put in jail. Nelson explained that she had already gone home that evening and told defendant "Hey I—I can't promise she never will [be wanted] . . . . But the other side of things, we let her go; but if we wanted her, Gary, we'd kept [*sic*] her. We kept you and Tony, didn't we?"

Several minutes later, Nelson again reminded defendant that it was dangerous for Stevens and his son if the killer remained at large. The interview continued as the officers pointed out discrepancies between Gary, Jr., and Stevens's versions of the day of the murder and defendant's version, but defendant refused to budge from his claim that an unnamed third party was the actual killer.

A hearing to suppress defendant's confession was heard before trial. Nelson testified that all conversations he had had with defendant on that day were recorded on the tapes presented to the court. He denied making any promises or threats to defendant relating either to defendant personally or his family. Sergeant Caronna similarly denied making any threats or promises.

Defendant also testified regarding the interviews. He stated that at one point before the taped interview Caronna pulled a gun on him and stated, "he was tired of fucking around," and that he could save the country a lot of money right there. Defendant was unsure of the timing of this event. Later during the interview, defendant stated, Caronna and Nelson threatened that they would put Gary, Jr., in jail if he did not tell them what they wanted to know. At another unspecified point Nelson told him that if he told all, the police would not bother Stevens and defendant's family. Defendant stated his motivation for talking with the police was to avoid trouble for his son and Stevens. In addition, defendant stated he had not eaten before his interview and it was his understanding that his son had not had food. He asked for food for himself and his son, but nothing was given to him for a long time afterward. He asserted that he had complained about the lack of food from the time he was first brought to the jail. He also claimed specifically that he complained about the treatment given him when he first met Nelson.

After hearing, the court stated it had carefully reviewed the taped statements and that its major concern was to assure that defendant's statements were voluntary. The court found credible evidence by Nelson that defendant had been fed along with the officers after the interviews and that food had not been denied in order to pressure defendant. Further, the judge found that the length of questioning was not excessive. Finally, the court noted, it did not find any implied threats; the officers were careful to explain that they were not trying to get at defendant's son and that Stevens had been released. The motion to suppress was denied.

We conclude that the trial court was correct. Defendant volunteered to speak with Officer Nelson without coercion. The interrogating officers did not imply that the fate of defendant's son and of Stevens depended upon defendant stating what they wanted to hear. They repeated that they did not want to involve Gary, Jr., and that their primary focus was on defendant and Lemock. Nor were any promises made that Gary, Jr., and Stevens would be left alone if defendant confessed. The officers informed defendant they had released Stevens but indicated expressly that there was no guarantee that they might not want her at some later point. Similarly, there is no showing that any request for food was denied or that food was withheld to coerce defendant.

As previously noted, when a reviewing court considers a claim that a confession has been improperly coerced, if the evidence conflicts, the version most favorable to the People must be relied upon if supported by the record. (*People* v. *Hogan, supra,* 31 Cal.3d at p. 835; *People* v. *Jimenez* (1978) 21 Cal.3d 595, 609 [147 Cal.Rptr. 172, 580 P.2d 672].) Application of that standard here means that our independent consideration is limited to the evidence contained on the tapes themselves. As has been reiterated, "mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary." (*People* v. *Jimenez, supra,* 21 Cal.3d at p. 611.) In terms of assessing inducements assertedly offered to a suspect, " '[w]hen the benefit pointed out by the police . . . is merely that which flows naturally from a truthful and honest course of conduct,' the subsequent statement will not be considered involuntarily made. [Citation.]" (*Id.* at pp. 611-612.) The police statements here constituted such permissible inducements.

Our independent review convinces us that no improper threats or promises were made to defendant personally or to his family or Stevens. In contrast to cases cited by defendant, such as *People* v. *Trout* (1960) 54 Cal.2d 576 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418], the police conduct in interviewing Gary, Jr., and Stevens was not an exercise designed

to threaten defendant either expressly or impliedly that his loved ones' release was totally dependent upon his conduct and his confession. The two were important witnesses and the police were fully justified in exploring the facts with them. Furthermore, as noted, the police disclaimed an interest in involving the two throughout the interviews with defendant.

Applying the applicable standards to the facts, we conclude that the court properly denied the motion to suppress and permitted introduction of the confession.

## 2. *Admission of David Kent's Testimony*

■ Defendant contends that the court improperly admitted testimony by David Kent regarding defendant's statements during the time the two men were housed in county jail. He relies on *United States* v. *Henry* (1980) 447 U.S. 264 [65 L.Ed.2d 115, 100 S.Ct. 2183], in support of his claim that Kent was acting as a government agent and admission of his statements therefore constituted an impermissible violation of his Sixth Amendment right to counsel. Recently, in *Maine* v. *Moulton* (1985) 474 U.S. 159 [88 L.Ed.2d 481, 106 S.Ct. 477], and *Kuhlmann* v. *Wilson* (1986) 477 U.S. 436 [91 L.Ed.2d 364, 106 S.Ct. 2616], the United States Supreme Court reaffirmed *Henry* but stressed that mere reporting by an informant was not enough: "[S]ome action, beyond merely listening, that was designed deliberately to elicit incriminating remarks" must be demonstrated. (*Kuhlmann, supra,* 477 U.S. at p. 459 [91 L.Ed.2d at p. 385, 106 S.Ct. at p. 2630].)

Starting in late June 1981, Kent was housed on the same tier of the jail as defendant, and shared his cell with Lemock. Kent met and conversed with defendant during their time at the jail. In the course of those conversations, defendant first told Kent that the victim had been shot by another person after he, defendant, had brought him to the barn. Eventually, defendant told Kent that he himself had done the shooting. At various times, defendant also told Kent he wanted Joy Stevens and her brother Walter, among others, killed. Defendant indicated he wanted Kent's help with this project and at one point showed photographs of Stevens and her baby to Kent to assist in identifying the proposed victims. When Kent asked about the baby, defendant responded, "Fuck the baby . . . ." Kent returned the pictures to defendant, stating that he did not want Lemock to see them in his possession and they might turn up during a cell search.

After returning the photographs, Kent asked his sister to contact Sergeant Caronna, who he knew from conversations with defendant had been involved in defendant's case. The next day, July 14, 1981, Detective Caronna met with Kent. It was their first meeting and neither Caronna nor

anyone else from the Redlands Police Department had prior knowledge of Kent or his information. At the meeting, Kent told Caronna about defendant's admissions regarding the shooting as well as his intentions as to Stevens and the others. Caronna told Kent not to ask any questions or request the pictures, but simply to listen and accept any material offered him. When asked at trial if he at that point was working for the police, Kent responded that he was not. He explained that his main purpose was to prevent harm to those threatened. He "didn't want these people killed." Kent emphasized that defendant's inclusion of the baby as a victim formed part of his motivation for going to the police.

On July 17, Kent again initiated a meeting with Caronna. Defendant had given Kent photographs of proposed victims and a map indicating how to reach them and Kent turned these items over to the police. Three days later, the police arranged a meeting at which they informed Kent that he might be called to testify. None of the meetings was tape recorded because Kent originally planned not to testify. He had testified for the prosecution in a previous murder trial and he was concerned about putting his life in jeopardy.

A deputy district attorney attended the final meeting to discuss possible testimony and Kent's requests for placement. Kent asked to serve his time in Southern California in a facility where he would not encounter persons against whom he had testified. He indicated that he feared for his life in the mainstream jail population if he testified. The district attorney made no promises regarding placement but stated he would try to accommodate Kent although he could not assure him officials could or would do so.

Kent had no other conversations with police or attorneys regarding defendant's statements. Kent was sentenced and left county jail on July 24. His only relevant additional contacts with law enforcement personnel before testifying involved settling the question of whether he would in fact appear. As noted, Kent was reluctant to do so, and although he finally agreed to appear voluntarily, he refused to discuss his testimony with the district attorney before taking the stand.

In *United States* v. *Henry, supra,* 447 U.S. 264, the United States Supreme Court held that testimony of an informant who shared the defendant's cell violated the Sixth Amendment. The court found that the informant was a government agent who had "deliberately elicited" incriminating statements from the defendant. (See *Massiah* v. *United States* (1964) 377 U.S. 201, 206 [12 L.Ed.2d 246, 250, 84 S.Ct. 1199].) This conclusion was based on three key factors: (1) the paid informant acted under instructions from a police officer; (2) he appeared to the defendant to be no more than

another inmate; and (3) defendant was in custody. The informant had acted as a paid informant for over a year when he was asked by an agent of the Federal Bureau of Investigation to watch the defendant and to listen to and report any relevant conversations. Under the fee arrangement made, the informant was to be paid "only if he produced useful information." (*United States* v. *Henry, supra,* 447 U.S. at p. 270, fn. omitted [65 L.Ed.2d at p. 122].) In concluding that the informant's conduct was attributable to the government, the high court rejected as insufficient the claim that the informant had been instructed not to question the defendant. It found that by his own statements, the informant had shown that he was not merely a "passive listener" but rather had actively engaged the defendant in conversations. (*Id.* at p. 271 [65 L.Ed.2d at pp. 122-123].)

In *Maine* v. *Moulton, supra,* 474 U.S. at page 176 [88 L.Ed.2d at p. 496], the court stressed that it does not matter who initiates the conversations during which incriminating statements are made to a government informant. The court reiterated that "knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity." Nothing in this pronouncement alters our conclusion in this case.

Defendant argues that the court's conclusion in *Henry, supra,* 447 U.S. 264, is equally applicable here. He asserts that Kent, who had previously informed for the government, was paid not in money but in a preferred prison placement. Once he had met with the officers, defendant argues, Kent became a government agent acting on the state's behalf despite instruction not to solicit any information from defendant. We disagree.

The circumstances bear marked similarity to those in *People* v. *Whitt* (1984) 36 Cal.3d 724 [205 Cal.Rptr. 810, 685 P.2d 1161]. Here, as there, the actions of the informant in an earlier case were unknown to the police. The informant's information was voluntarily proffered and after an initial contact with police he was warned not to seek further information.[4] The informant in *Whitt* received no lenient treatment for his testimony. In the present case, while Kent may have been placed in Southern California, his term was not affected. Moreover, although he may have gotten the placement he desired, he had not been promised any quid pro quo in return for evidence before he testified.

---

[4] Compare the informant in *Maine* v. *Moulton, supra,* 474 U.S. 159, who had struck a deal with the prosecution and who actively engaged in the relevant conversation wearing a wire to transmit information to the police. In contrast, the informant in *Kuhlmann, supra,* 477 U.S. 436, who had been purposely placed by the police in defendant's cell, acted as a mere listener to the defendant's spontaneous admissions and no violation was found.

In *Whitt* we construed *Henry* as "indicat[ing] that in deciding whether information has been 'deliberately elicited,' the courts must focus on the state's conduct as a whole, rather than on the informant's . . . . [W]here the state has directed an informant to obtain incriminating information, or where it has created powerful inducements for him to do so—particularly in a custodial setting—it is not significant whether the informant or the accused initiated the conversation." (36 Cal.3d at p. 741.) Although recognizing that the informant's contacts with the police may have arisen from his expectation that he would receive a return for his information, we concluded in *Whitt* that where there was no prior arrangement with the informant, "the mere acceptance of his information, even with the promise to talk to the prosecutor, is not sufficient encouragement to hold the police accountable for [the informant's] subsequent actions. Furthermore, the promise to speak to the prosecutor was in no way conditioned on [the informant] providing any further information." (*Id.* at p. 744.) Finally, it was also significant that no leniency was ever obtained.

In this case, it is arguably even clearer that no improper conduct occurred. Kent initiated contact with the police. No discussions regarding any possible benefit to Kent because of his information were had until the third and final meeting. The first two conferences, set up at Kent's request, were the ones at which the bulk of his relevant knowledge was communicated. Kent stated his motivation was protection of those threatened, particularly Stevens's baby. He did not seek compensation in return. Once the police knew of his position, Kent was told not to solicit information from defendant, and there is no claim that he breached that directive. Throughout the pretrial period, Kent displayed reluctance about testifying, as evidenced by his refusal to have his conversations taped or to discuss his testimony with the district attorney. There is no evidence of any improper "exploitation" by the police of Kent's position.

In summary, under the circumstances here, we find no violation of defendant's Sixth Amendment right to counsel. Even if Kent became a government agent after contacting the officers, the major portion of his testimony related to events learned before his first meeting on July 14. Any additional evidence gained was primarily cumulative and any arguable error in admitting it was harmless.

### 3. Out-of-court Statements by Lemock

Several witnesses testified over defense objection to statements made by Lemock, who did not testify and was declared unavailable as a witness. ██ Defendant contends that the statements were inadmissible

hearsay and their introduction denied him his constitutional right to confrontation.

James Cuellar, a former employee of Lemock, testified that in approximately March 1981 he saw Lemock and the victim engaged in a discussion. After the victim departed, Lemock told Cuellar that he, the victim, was "screwing up" his business in Redlands. Cuellar described Lemock as in a "distressed state of mind" and stated Lemock told him that he would like to "snuff the son-of-a-bitch."

Stan Wilson testified that in early 1981 he saw Lemock at his office. Lemock, whom Wilson described as being in "an extremely upset" condition, and in "a rage of sorts," told Wilson that he had just exchanged heated words with the victim. Wilson saw Lemock knock over some signs and heard him say he would "like to get his hands on that son-of-a-bitch's neck." At that point, Lemock made a choking gesture with his hands. A few days later, Lemock informed Wilson that he expected that the "Redlands problem" would soon be resolved.

In April 1981, Lemock informed Diane Jensma that he wanted to find someone to help scare the victim. In early May, two or three weeks before the victim was killed, Lemock again met with Jensma. She described him as uptight and upset. Lemock told her that he no longer could handle the situation and that he wished to kill the victim.

Defendant objected to each of these statements on the grounds of hearsay and irrelevancy. The trial court overruled the objections and permitted the testimony to be heard. The court also, however, admonished the jury that the evidence of Lemock's statements was being admitted only for the limited purpose of explaining *Lemock's* later actions.

Defendant now claims error, arguing that the statements should have been excluded on the basis that they were made under circumstances which indicated lack of trustworthiness. He also contends that the jury would have been required to undertake an "exceedingly subtle and tenuous reasoning process" in order to consider the evidence correctly and that on that basis the evidence also should have been barred.

Evidence Code section 1250, subdivision (a), states in pertinent part that "evidence of a statement of the declarant's then existing state of mind [or] emotion . . . is not made inadmissible by the hearsay rule when: (1) The evidence is offered to prove the declarant's state of mind [or] emotion . . . at that time or at any other time when it is itself an issue in the action; or (2) the evidence is offered to prove or explain acts or conduct of the declarant."

Section 1252 provides that such evidence will not be admitted "if the statement was made under circumstances such as to indicate its lack of trustworthiness."

Defendant concedes that the challenged statements "might qualify for admission under Section 1250(a)(2) as statements of his then existing state of mind, . . . to prove conduct in conformity with that state of mind, to wit, that Lemock would attempt to hire someone to kill or 'rough up' Berkey." Nonetheless, he focuses on Evidence Code section 1252, arguing that because the statements were made when Lemock was upset and angry, they were less than trustworthy because they were merely expressions of his rage at the particular time.

Under this analysis, unless a declarant presents a calm and collected demeanor to his listener, his statements must always be rejected as untrustworthy. This conclusion is not consistent with Evidence Code section 1252's terms. Defendant relies primarily upon *United States* v. *Layton* (N.D.Cal. 1982) 549 F.Supp. 903, but in fact that case is of little assistance.[5]

In *Layton,* the United States Attorney sought to introduce evidence of statements made by Jim Jones to Peoples Temple members threatening harm to members of a soon-to-arrive investigating party led by Congressman Ryan. (549 F.Supp. at p. 908.) The *Layton* trial court found three prerequisites must be met before a hearsay statement may be admitted: (1) the statements were contemporaneous with the later event for which they are offered in proof or "not too far distant in time" from the significant event; (2) the declarant had no opportunity to reflect or fabricate or misrepresent his thoughts; and (3) the statements must be relevant to an issue raised in the case. (549 F.Supp. at p. 909.)

In California, there has been no such neat breakdown of the requirements for finding a statement trustworthy. For example, in *People* v. *Hamilton* (1961) 55 Cal.2d 881, 893 [13 Cal.Rptr. 649, 362 P.2d 473], the court reiterated that such statements should be admitted only where they "are shown to have been made under circumstances indicating that they are reasonably trustworthy, and when they show primarily the then state of mind of the declarant and not the state of mind of the accused." ▮ One relevant general principle is that admissible declarations should be " 'those

---

[5] Significantly, the district court's finding in *Layton* that the proffered statements were not admissible was overturned by the Ninth Circuit (see *People* v. *Layton* (9th Cir. 1983) 720 F.2d 548), which held that the statements at issue could be introduced under the coconspirator exception to the hearsay rule. Because it relied upon that exception, the Ninth Circuit found it unnecessary to further consider other possible bases for permitting introduction of the evidence.

of a present existing state of mind, made in a natural manner and not under circumstances of suspicion [so that they] carry the probability of trustworthiness. (VI Wigmore, § 1725, p. 80.)' . . . . Wigmore also has stated that such declarations are admissible only when they are 'made at a time when there was no motive to deceive.' (6 Wigmore, Evidence (3d ed. 1940), § 1730, p. 94.)" (*Id.* at p. 895.) No specific time frame is required. ▇▇▇ The statements here, made in the months before the killing, are timely in that they show Lemock's state of mind leading up to his arrangement with defendant. Thus, defendant is off the mark in arguing that "The chance of Lemock's statements being trustworthy as they relate to any conspiracy between him [Lemock] and Gary Howard [defendant] is thus nil." The statements were not offered to show a conspiracy between Lemock and defendant. Instead, as the court instructed the jury, they were introduced to show Lemock's state of mind in order to explain why he then conducted himself as he did with regard to seeking Berkey's death.

Next, as to misrepresentation, defendant argues that because Lemock was upset each time he made the remarks, "they did not actually represent his true state of mind." However, as indicated above, this argument is unavailing. Defendant makes no contention that the statements were made at a time after Lemock had an opportunity to reflect. The fact that they were made at a point when Lemock was "in a rage" and upset and had just spoken with the victim indicate that they were spontaneous utterances revealing his actual state of mind. Nothing in the circumstances made them inherently untrustworthy.

Finally, defendant argues that, as was the case in *Layton,* the statements should have been barred because they may well have been misapplied by the jury. The court outlined what it perceived as a long and somewhat convoluted path of reasoning which would have to be followed in order to properly consider the evidence.[6] Because the required chain of logic was so subtle, the court concluded that it was more likely that the jury would simply assume that in making the statements involved, Jones acted as spokesman for all followers, which would include Layton. Thus if Jones said he wanted Ryan shot, then Layton wanted him shot as well.

Defendant tries to fit the evidence at issue here into the *Layton* mold. The evidence, however, is much more direct. It was offered to show what

---

[6] "[T]he fact that Jones made these statements makes it somewhat more likely that, when the killings finally did occur, he had something to do with them. Since he was in a position of authority and was even an object of adulation at Jonestown, the fact that it is more likely he had something to do with the killings makes it somewhat more likely that a large number of his devoted followers were involved, too. Since it is more likely that a large number of his followers were involved, it makes it somewhat more likely that Layton was involved as well." (*United States* v. *Layton, supra,* 549 F.Supp. at p. 909.)

Lemock intended. The relationship between Lemock and defendant bore no similarity to that between Jones and Layton. The jury was unlikely to jump to the conclusion that simply because Lemock had expressed a desire to have the victim killed, defendant would have had a similar wish.

This last analysis also applies to defendant's claim that the evidence should not have been admitted because the statements were so potentially prejudicial that their probative value was outweighed. The statements regarding Lemock's wishes were used not only to show his state of mind but also to explain his conduct in paying defendant money. They were clearly relevant and not in and of themselves highly prejudicial regarding the reasons for *defendant's* conduct.

Defendant's final challenge is based on an asserted denial of his Sixth Amendment right to confrontation. Defendant argues that only one indicium of reliability applies here of those set forth in *Dutton* v. *Evans* (1970) 400 U.S. 74 [27 L.Ed.2d 213, 91 S.Ct. 210], where the Supreme Court set the requirements for analyzing when the confrontation clause might bar introduction of hearsay evidence otherwise admissible under an exception. This factor is the "misrepresentation issue," and defendant merely cites his previous argument which has already been addressed.

Finally, defendant relies upon the transcript of Lemock's trial, which occurred after his, to argue that Lemock's later testimony should be used to evaluate the propriety of the trial court's determination in defendant's case to permit the evidence to be heard. We have judicially noticed the information and the jury verdicts in Lemock's trial. Defendant relies on a federal appellate court case which focuses on whether the circumstances demonstrate that unavailability of the declarant will deprive the jury of a sufficient basis to evaluate the extrajudicial statements being offered. (*United States* v. *Weiner* (9th Cir. 1978) 578 F.2d 757.) Defendant argues that the jury here could not properly evaluate the statements because it did not have the benefit of later testimony by Lemock that his remarks were made when he was under the influence of alcohol and drugs and was overreacting.

Unavailability is often based on the fact that the witness is yet to be tried for his acts. Evaluation of whether the statements should be admitted must be based on the information then available to the court. It would turn the concept topsy-turvy to say, as defendant urges, that once a witness, unavailable because of his exercise of the right against self-incrimination, has finally testified, a reviewing court may look to the substance of that later testimony to assess whether the jury at the initial proceeding had been denied an opportunity to evaluate the hearsay statements.

■ Defendant next challenges the admission of statements by Walter Wilson, Diane Jensma and Barbara Wilson Chapman regarding Lemock's efforts to have drugs planted in Berkey's car. He similarly objects to the introduction of evidence concerning Lemock's proposal to Norm Butters to establish a phony business to undercut Berkey. He asserts that these statements should have been excluded under section 352 of the Evidence Code because they were only minimally probative and were substantially prejudicial.

As indicated, the trial court admonished the jury that this evidence was relevant to show *Lemock's* state of mind and intent and to explain to some extent his actions thereafter. The evidence was highly relevant to help the jury understand the circumstances leading up to Lemock's dealings with Howard and to explain why Lemock acted as he did. The jury was properly instructed as to the limited use of the evidence and the trial court did not abuse its discretion in permitting the evidence to be heard. In any event, as the People observe, the plot to place narcotics in Berkey's car had been related by defendant to Officer Nelson and evidence as to defendant's own statements on this issue was offered without objection.

In conclusion, the trial court did not err in admitting the various statements challenged by defendant. The jury was instructed on the permissible use of the evidence and no basis for reversal on these grounds is presented.[7]

### III. SPECIAL CIRCUMSTANCES ISSUES

#### 1. *Instructions Defining Financial Gain*

Defendant requested that the trial court give one of three instructions to clarify the meaning of the special circumstance charged, namely, that "the murder was intentional and carried out for financial gain." (§ 190.2, subd. (a)(1).)[8] The prosecutor took the position that there was no need to clarify

---

[7] Defendant also objects to the admission into evidence of a $750 check payable to Lemock's girlfriend on Lemock's account dated two days after the murder. He asserts the check was irrelevant and that its admission was prejudicial error. No basis for reversal is shown, as the check was relevant evidence and defendant did not object to its admission. (*People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468].)

[8] The three alternatives offered were: (1) "In order to find the special circumstance to be true, you must be convinced beyond a reasonable doubt that the murder was intentional and was carried out pursuant to an agreement by the person committing the murder to accept valuable consideration for the act of the murder from some person other than the victim."

(2) "In order to find the special circumstance to be true, you must be convinced beyond a reasonable doubt that the person who committed the murder was the one who did or was to benefit financially."

(3) "In order to find the special circumstance to be true, you must be convinced beyond a reasonable doubt that: (a) the murder was intentional; (b) the defendant either committed the

the term "for financial gain" because it was a matter of common understanding and the Legislature did not intend that its meaning be restricted, certainly not in the manner sought by defendant.

The trial court denied the requests and instructed the jury that if it found defendant guilty of murder in the first degree, "you must then determine if the murder was committed under the following special circumstance: (1) that the murder was intentional, and (2) that it was carried out for financial gain."

■ Defendant first argues that the court had a sua sponte duty to define financial gain. ■ Such a duty arises where the terms have a technical meaning that is peculiar to the law. As Justice Mosk observed in *People* v. *Failla* (1966) 64 Cal.2d 560, 565 [51 Cal.Rptr. 103, 414 P.2d 39], "The general rule provides that in defining the elements of a crime it is enough for the court to instruct in the language of the statute when the defendant fails to request an amplification thereof. [Citations.] But that rule is always subject to the qualification that ' " ' An instruction in the language of a statute is proper only if the jury would have no difficulty in understanding the statute without guidance from the court.' " ' (*People* v. *Thomas* (1945) 25 Cal.2d 880, 895 [156 P.2d 7].)" However, it is well settled that where the terms "have no technical meaning peculiar to the law, but are commonly understood by those familiar with the English language, instructions as to their meaning are not required. [Citations.]" (*People* v. *Anderson* (1966) 64 Cal.2d 633, 639 [51 Cal.Rptr. 238, 414 P.2d 366].)

■ Defendant contends that *Failla, supra,* 64 Cal.2d 560, requires that the language in the statute here should have been amplified in instruction. No definition is contained in the statutory language itself, and defendant contrasts former section 190.2, subdivision (a) (Stats. 1977, ch. 316, p. 1257), which read "The murder was intentional and was carried out pursuant to agreement by the person who committed the murder to accept a valuable consideration for the act of murder from any person other than the victim." The thrust of defendant's argument is that "unless the financial gain is the direct, intentional, and motivating cause of the murder, the special circumstances cannot apply." This restricted definition is not made clear by the unadorned statutory language, but is necessary, defendant asserts, or else any murder where the defendant benefits financially, even though the financial benefit may not have been part of the motivation, will fall under the terms of the provision.

murder or solicited someone else to do so; (c) that the defendant either benefited financially from the act of the killing or solicited the murder for the purpose that someone else might benefit financially."

It does not appear that the difference in language between the former and present provisions indicates that it was intended that financial gain be limited in the manner defendant suggested in his proffered instructions. In *People* v. *Bigelow* (1984) 37 Cal.3d 731, 751 [209 Cal.Rptr. 328, 691 P.2d 994], we observed there was little to guide us in interpretation of this special circumstance. We there construed section 190.2, subdivision (a)(1), in the context of the claim that, if read broadly, it would *overlap* to a large degree with the special circumstances enunciated in subdivision (a)(17) which deals with felony murder and includes robbery felony murder. We determined that it was appropriate for the court to construe special circumstances in such a way as to minimize the application of multiple special circumstances arising out of the same conduct. Therefore, we adopted a construction "under which the financial gain special circumstance applies only when the victim's death is the consideration for, or an essential prerequisite to, the financial gain sought by the defendant." (*Ibid.*)

Defendant now asserts that *Bigelow, supra,* 37 Cal.3d 731, supports his assertion that at least the first version of his proffered instruction should have been given or the judge should have sua sponte fashioned an explanatory instruction. We conclude that the trial court did not err in acting as it did in this pre-*Bigelow* trial.

First, defendant's instruction required the jury to find that there was an *agreement* pursuant to which the person committing the murder agreed to accept some consideration for the act of the murder. Defendant argues that it was possible here that the object of the contract was that defendant would "rough up" the victim and that the jury, if instructed as requested, could have found the special circumstance not to be true because the only "consideration" for the financial gain sought by defendant was the roughing up of the victim.

This argument exposes the fundamental problem with defendant's claim. He focuses on the terms of the agreement which was reached before the murder occurred. The special circumstance focuses on the defendant's intention *at the time the murder was committed*. Even if the agreement would have been satisfied by less than the victim's murder, the relevant inquiry is whether the defendant committed the murder in the expectation that he would thereby obtain the desired financial gain.[9]

---

[9] Defendant's other proffered instructions were similarly flawed. His second alternative would not have embraced the prospect that the killing was committed with the expectation that *another* would benefit financially, and his third formulation was overly restrictive in requiring either that he *actually* benefit from the killing or that the killing have been solicited so that another might benefit. None of his proffered instructions accurately stated the law, and none was necessary.

In addition, *Bigelow* does not expressly require that instructions utilizing the limited construction adopted in that opinion be given in all cases. Even though such instructions may in some instances be necessary in order to avoid the overlap which that opinion is intended to cure, there is no such necessity here. Our major concern in *Bigelow* was to prevent overlapping special circumstances findings based on the same conduct. Defendant attempts to derive from that decision an interpretation of the financial-gain special circumstance which is more restrictive than is necessary to avoid application of multiple special circumstances to one form of conduct.

*Bigelow's* final articulation of the scope of the provision must be viewed in terms of the problem it sought to correct. In this case, the victim's death was the "consideration" for the financial gain that defendant sought; in other words, defendant killed the victim in order to benefit financially.[10] Use of the word "consideration" arguably conjures up contract law and may improperly, as is inherent in defendant's argument here, shift the focus backwards towards the time that a relevant "agreement" was made. We conclude, therefore, that *Bigelow's* formulation should be applied when it is important to serve the purposes underlying that decision, but that it is not intended to restrict construction of "for financial gain" when overlap is *not* a concern.

No problem of the kind present in *Bigelow* existed here.[11] Nor, as indicated above, was any impermissible confusion engendered regarding the meaning of the term "for financial gain." The phrase is not a technical one, except for the circumscriptions of *Bigelow*. Moreover, the statutory language, when contrasted with the language of the 1977 law, indicates that it was intended to cover a broad range of situations. Accordingly, there is no necessity in this case for further refinement or restrictive interpretation of the special circumstance in the absence of additional indications that the statutory language itself could have caused confusion.[12]

---

[10] Nothing in the special circumstance's language requires a preexisting "agreement" before the circumstance is found true. What is relevant is the particular defendant's purpose, whether or not achievable.

[11] Even though the evidence showed that defendant took the victim's wallet, this conduct was not charged as a robbery, nor was a felony-murder special circumstance based on robbery alleged, argued, or relied upon by the prosecution.

[12] At reargument, defense counsel acknowledged that the perpetrator's intent was relevant. She argued, however, that because the prosecution theory required "reciprocal intent," that is, an actual meeting of the minds between Lemock and defendant, the proposed instructions should have been given in order to require the jury to find the existence of a "valid" contract between the two men. As we have explained, no such actual agreement was necessary. The issue was defendant's intent at the time the murder was committed, not whether that intent arose pursuant to a contractual agreement. Defendant's newly raised claim is without merit.

## 2. *Collateral Estoppel*

Lemock was charged with Berkey's murder in the same information as defendant. It was alleged that Lemock was a principal in the murder and also that he "intentionally aided, abetted, counseled, commanded, induced, solicited, requested or assisted Gary Lee Howard, Sr., in the commission of the murder of Walter A. Berkey for financial gain within the meaning of Penal Code section 190.2(b)." Had he been found guilty under this allegation, he potentially would have been subject to either the death sentence or life imprisonment without possibility of parole.

As noted, Lemock's case was severed from defendant's and his trial was held after judgment had been reached in defendant's trial. Lemock was found not guilty. As that trial terminated at the determination of guilt, the question of the applicability of special circumstances, and specifically section 190.2, subdivision (b), was never expressly ruled upon by the jury.

Defendant asserts that the doctrine of collateral estoppel, as analyzed in *People* v. *Taylor* (1974) 12 Cal.3d 686 [117 Cal.Rptr. 70, 527 P.2d 622], should apply here, requiring at a minimum reversal of the special circumstance finding and, more generally, reversal of the conviction as a whole. In *Taylor*, the defendant and two companions, Daniels and Smith, planned a robbery. Taylor remained in the getaway car as the other two entered the store. The ensuing chain of events resulted in Smith's death after he was shot by one of the storekeepers.

Taylor's initial conviction was reversed. In the interim before his second trial, Daniels was separately tried and convicted of robbery, but acquitted on the murder charge. Taylor then sought to have the murder charge against him dismissed on the basis of collateral estoppel. We explained that collateral estoppel bars litigation of an issue which has been decided at a previous trial "if (1) the issue necessarily decided at the previous trial is identical to the one which is sought to be relitigated; if (2) the previous trial resulted in a final judgment on the merits; and if (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the prior trial. [Citations.]" (12 Cal.3d at p. 691.)

In *Taylor*, the defendant remained outside at the wheel of the getaway car while the shooting took place. He could be found guilty of murder only if it were found that Daniels or Smith harbored malice which could be attributed to defendant as an aider and abettor. At Daniels's trial the People had unsuccessfully tried to establish that either of Taylor's cohorts had harbored the requisite malice. In considering whether Daniels's acquittal barred proceeding against Taylor, we reviewed the three purposes underly-

ing application of collateral estoppel: "(1) to promote judicial economy by minimizing repetitive litigation; (2) to prevent inconsistent judgments which undermine the integrity of the judicial system; and (3) to provide repose by preventing a person from being harassed by vexatious litigation." (12 Cal.3d at p. 695.) Focusing on the second purpose, we observed that few things were more likely to undermine faith in the system than permitting a person to be punished for another's acts when the actor has been previously exonerated from any responsibility for those identical acts. (*Id.* at p. 696.)

We determined that *Taylor* was such a case and that collateral estoppel therefore should be applied to bar the state from proceeding against defendant on a murder charge. We expressly limited our holding "to the particular circumstances of the instant case where an accused's guilt must be predicated on his vicarious liability for the acts of a previously acquitted confederate." (12 Cal.3d at p. 698.)

Defendant's reliance on the doctrine enunciated in *Taylor,* and its later application in *People v. Superior Court (Jackson)* (1975) 44 Cal.App.3d 494 [118 Cal.Rptr. 702], where the Court of Appeal held that a person accused of conspiracy could not be tried for that crime when all his alleged coconspirators had been previously acquitted, falls far short of the mark. First, defendant's liability here was not "vicarious"; defendant was tried as the actual killer of Berkey. It was not necessary that malice or any other state of mind be imputed to him from the acts of another. Second, defendant was tried *prior* to Lemock. In *Taylor,* we repeatedly referred to the effect of a *previous* acquittal of a codefendant and its effect on a defendant's later trial. Defendant cites no case and we have found none in which a verdict at a later trial was found to bar a prior judgment. Third, *Taylor* is of limited application. ▬▬ The general rule is that acquittal of one codefendant normally will not require acquittal of another.[13]

▬▬ In addition, the only jury verdict rendered at Lemock's trial was the finding that he was not guilty. There was no express verdict on the charge involving subdivision (b) of section 190.2. The question whether the special circumstance of financial gain applied thus was not adjudicated.

---

[13] As the court explained in *People v. Mata* (1978) 85 Cal.App.3d 233, 237 [149 Cal.Rptr. 327], "It is clear that in cases where there are multiple defendants, or in multiple cases arising out of the same offense, the mere fact standing alone that verdicts are, or appear to be, inconsistent, does not give rise to collateral estoppel. Specific issues may be decided differently in different cases. [Citation.] Likewise, a judgment acquitting one defendant does not generally bar subsequent criminal liability of a codefendant. As the court said in *People v. Scoglio* (1969) 3 Cal.App.3d 1, 4 [82 Cal.Rptr. 869]: 'It is well settled that where the same criminal act or transaction gives rise to criminal liability in more than one defendant, a judgment acquitting one defendant does not operate as res judicata in the prosecution of another defendant. [Citations.]' "

Moreover, the financial gain special circumstance found against defendant was not necessarily dependent upon any action or state of mind on Lemock's part. All that was required was that defendant murder the victim with the intent to thereby obtain some financial gain. Thus, for example, if a man murders his wife intending to benefit from life insurance proceeds, but it turns out that the policies have been cancelled, the special circumstance could still apply. Similarly, here, Lemock might have convinced a jury, for example, that while at some point he said, "I'd pay a million dollars to the man who gets Berkey," he was merely using hyperbole and never intended anyone to act on the statement.[14] It could be shown, however, that defendant believed the statement and undertook the murder of Berkey in order to collect. Thus, there was no necessity to show that an actual contract was agreed upon by defendant and Lemock in order for section 190.2, subdivision (a)(1), to be found applicable to defendant.[15]

In summary, for a variety of reasons, Lemock's trial does not give rise to application of the doctrine of collateral estoppel requiring vacation of either defendant's murder conviction as a whole or of the special circumstance finding against him. No vicarious liability was involved and no prior adjudication of any fact necessary to defendant's conviction resulted in a finding that would necessarily exonerate defendant. We therefore reject this claim.

### 3. *Corpus Delicti of the Special Circumstance*

 Defendant contends that the only evidence that Lemock hired him to kill, as opposed to "rough up" Berkey, came from his confession. He asserts that his statement could have been a "fabrication" offered when defendant felt forced after prolonged questioning to explain the crime which had occurred. He therefore asserts that because this was the only evidence of a killing for hire which provided the basis for the special circumstance

---

[14] This is used as example only and not intended to represent the actual defense at Lemock's trial. We note, however, that the prosecution could have presented the exact same evidence at trial as was presented here, and collateral estoppel still would not apply. Lemock, for reasons peculiar to him, could have raised numerous defenses which would in no way have affected or alleviated *defendant's* culpability.

[15] At reargument, defendant advanced a new theory. Counsel asserted that collateral estoppel should apply because the verdict in the Lemock case negated the existence of an actual contract to kill upon which the entire prosecution case against defendant rested. Because, counsel contended, the actual contract was essential to the prosecution's case against him, defendant therefore had no opportunity to defend on any other theory. For example, counsel suggested, defendant could have defended on the ground that he believed he was only to rough up the victim, but that events escalated when the victim resisted and the subsequent murder was at most second degree. Nothing prevented defendant from advancing such a defense. The belated assertion is without merit.

finding,[16] the corpus delicti rule should apply and require the prosecution to establish the fact of the contract to kill independently of his statements.

Initially we repeat that, as stated in our discussion of defendant's *Bigelow* (37 Cal.3d 731) claim, it was not necessary for the prosecution to show any preexisting agreement of the nature argued here. Defendant's motive for killing, independent of any actual contract, provided the basis for the special circumstance finding. But even if proof of a contract to kill were required, there would be no necessity to prove it independently of defendant's admissions.

Relying upon *People* v. *Mattson* (1984) 37 Cal.3d 85, 94 [207 Cal.Rptr. 278, 688 P.2d 887], footnote omitted, defendant argues that the rule established there that "the corpus delicti of the felony-based special circumstances must be proved independently of an accused's extrajudicial statements" (p. 94, fn. omitted), should similarly apply to the financial-gain special circumstance (§ 190.2, subd. (a)(1)). In *Mattson,* we focused on the language of former section 190.4, subdivision (a) now restated in the present section 190.4, subdivision (a), which requires that if a special circumstance "requires proof of the commission or attempted commission of a crime, *such crime shall be charged and proved pursuant to the general law applying to the trial and conviction of the crime.*" (Italics added.)

In *People* v. *Cantrell* (1973) 8 Cal.3d 672, 680-681 [105 Cal.Rptr. 792, 504 P.2d 1256], we held that the People were not required to establish, independently of the defendant's statements, the corpus delicti of an underlying felony which was used in order to obtain a conviction of murder based on a felony-murder theory. In *Mattson* we concluded that the inclusion of the language in section 190.4 requiring charging and proof pursuant to applicable general law made the rule in *Cantrell* inapplicable to instances where the underlying felony was charged as a special circumstance. Noting that section 190.4's references to "general law" incorporates the corpus delicti requirement, we found significant the section's provision that such crimes must be "charged," as a further indication that they must be proved in the same manner as if they were independent crimes. (37 Cal.3d at pp. 93-94.) But the language of section 190.4, subdivision (a), relied on in *Mattson* does not apply to the special circumstance alleged here, which does not require proof of the commission of any crime in addition to the murder itself.

In *People* v. *McDermand* (1984) 162 Cal.App.3d 770 [211 Cal.Rptr. 773], the Court of Appeal considered the application of *Cantrell, supra,* 8 Cal.3d

---

[16] In making his factual claim, defendant ignores the testimony of Stevens and Norm Butters concerning the various transactions in which money passed between Lemock and defendant.

672, and *Mattson, supra,* 37 Cal.3d 85, to a special circumstance that the two murders at issue had been committed by means of lying in wait (§ 190.2, subd. (a)(15)). The court harked back to *Cantrell,* observing that there we "held that once the corpus delicti of murder had been established . . . it was entirely proper for the prosecution to rely upon the defendant's extrajudicial admissions to prove the 'circumstances surrounding the crime' " and on that basis to find that the defendant was guilty of first degree murder. (*People* v. *McDermand, supra,* 162 Cal.App.3d at p. 798, citing *People* v. *Cantrell, supra,* 8 Cal.3d at pp. 680-681.) In other words, in *Cantrell* we permitted use of extrajudicial statements to establish the degree of the crime.

The *McDermand* court found no logical reason to conclude that the rule of *Mattson, supra,* 37 Cal.3d 85, holding that extrajudicial statements could not support a felony-based special circumstance finding should extend to a special circumstance not so based. As noted in *McDermand,* we did not disapprove of *Cantrell's* holding in *Mattson*; rather, we concluded that an exception to the *Cantrell* approach was required by the specific language of section 190.4, construed in the light most favorable to defendant. The *McDermand* analysis makes sense. Our departure in *Mattson* from the rule of *Cantrell* was based on statutory language inapplicable here, and neither logic nor precedent requires its extension to special circumstances such as this one.

Defendant's claim is in part also based on the assertion that the special circumstance charged here required proof of a conspiracy between defendant and Lemock to kill Berkey. No conspiracy was charged, however, and as has been explained previously, an actual agreement was not required in order to find that defendant committed the murder for financial gain.

For the foregoing reasons, we conclude that *Mattson's* holding does not apply to the present case.

## IV. Penalty Phase Issues

### 1. *Witherspoon-Witt Challenges*

 Defendant challenges the trial court's exclusion of four prospective jurors for cause. In each instance defendant asserts that the prosecutor improperly questioned or "turned around" the veniremen in such a manner that the prospective jurors were induced to become more adamant about their inability to vote for the death penalty under any circumstance.

For each prospective juror, the court began by explaining the purpose of voir dire and briefly describing the proceedings. Included in the description

was the information that should the defendant be found guilty of first degree murder and should the charged special circumstance involving killing for hire be found true, two penalties could be imposed by the jury, namely, life imprisonment without possibility of parole or death. Each of the four jurors, when initially questioned by the court, stated he or she could vote for the death penalty in appropriate circumstances, but in each case the juror also expressed some uncertainty or ambiguity about his or her position.

For example, in response to the question "Do you have any religious or moral or emotional reservations about having to make the decision as to whether a person lives or dies?" Arzell Cole told the judge, "No. The only thing is I don't want to make no kind of—say nothing about nobody living. I prefer to say that I would want them to live, you know. I want a person to live." Similarly, Josie Cordova told the court that he was not conscientiously opposed to the death penalty, but his sons were and that might have some effect on him. He also explained that "it probably would bother me for the rest of my life if I was to sit on a jury and this [a death verdict] would happen" and that factor might "possibly" lead him to be unable to vote for the death penalty.

Lisa Kazalunas began by announcing she would prefer to give a life sentence and at one point stated she would vote against the death penalty on a ballot measure "Because I—I don't feel that I should—should be the one that could be responsible for sending someone to death." Vivian Hawkins, the last juror whose exclusion is challenged, started by telling the court she didn't "really believe" in the death penalty although she "guessed" she could judge someone on it.

Thus, while in each instance during the initial questioning by the judge the jurors ultimately stated they could impose the death penalty, during that period of questioning they expressed some clear reluctance or ambiguity as well. The defense attorney and prosecutor were given an opportunity to further question the jurors on their attitudes and it is the prosecutor's questioning to which defendant objects. For example, the prosecutor informed Mr. Cole that "you have either death or you have life without parole. And there's not going to be anybody in there twisting your arm and saying, 'Mr. Cole, you have to vote for the death penalty.'" He later stressed again that the juror would have a choice during penalty deliberations. Mr. Cole then stated, that, with the above information in mind, he would vote for life imprisonment without parole as opposed to death. Defendant argues that the prosecutor erroneously informed Cole that he had an "absolute choice" once the penalty phase began. Defendant contends, under California law, jurors do not have such an absolute choice but instead

"must consider the evidence presented at the penalty phase and vote as indicated by the law and by their deliberations."

This claim is without merit. The purpose of voir dire in a death penalty case such as this was described in *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], and most recently in *Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844]. In *Witherspoon,* which provided major guidance at the time of voir dire in this case, the high court observed that "Unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position." (391 U.S. at p. 516, fn. 9 [20 L.Ed.2d at pp. 781–782].) The court explained "The most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings." (*Id*. at p. 522, fn. 21 [20 L.Ed.2d at p. 785].)

In *Wainwright* v. *Witt, supra,* 469 U.S. 412, the high court reexamined *Witherspoon* and its application in the intervening period. Following the decision in *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726], the court noted, jurors were no longer vested with unlimited discretion as had been the case in *Witherspoon*. In view of the greater delineation and restriction upon the role of the jury under current laws, "whether or not a venireman *might* vote for death under certain *personal* standards, the State still may properly challenge that venireman if he refuses to follow the statutory scheme and truthfully answer the questions put by the trial judge." (469 U.S. at p. 422 [83 L.Ed.2d at p. 850].) Thus, the *Witherspoon* language requiring a showing that a prospective juror would automatically vote against the death penalty no longer prevails, and, the court observed, in any event was dictum. (*Ibid.*)

The court explained "there is nothing talismanic about juror exclusion under *Witherspoon* merely because it involves capital sentencing juries . . . . Here, as elsewhere, the quest is for jurors who will conscientiously apply the law and find the facts." (469 U.S. at p. 423 [83 L.Ed.2d at p. 851].) Thus, the applicable standard is determination of "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' . . . . [T]his standard likewise does not require that a juror's bias be proved with 'unmistakable clarity.' This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." (*Id.,* at p. 424 [83 L.Ed.2d at pp. 851–852], fn. omitted.)

■■■ The determination of the propriety of a challenge is left to the trial judge, to whose decision deference must be paid. (469 U.S. at pp. 428-429 [83 L.Ed.2d at p. 854]; accord, *People* v. *Fields* (1983) 35 Cal.3d 329, 355-356 [197 Cal.Rptr. 803, 673 P.2d 680] [where juror gives conflicting answers, trial court's determination of his state of mind binds appellate court]; *People* v. *Floyd* (1970) 1 Cal.3d 694, 725 [83 Cal.Rptr. 608, 464 P.2d 64].) No particular language must be used to elicit particular responses, nor must questions "be framed exclusively in the language of the controlling appellate opinion . . . ." (469 U.S. at pp. 433-434 [83 L.Ed.2d at pp. 857-858].) In the final analysis, "the question is not whether a reviewing court might disagree with the trial court's findings, but whether those findings are fairly supported by the record," and ambiguities are to be resolved in favor of the trial court's assessment. (*Ibid.*)

■■■ Under either the *Witherspoon* "automatic vote" or the *Witt* "refusal to follow the statutory scheme" approach, there was no error in the trial court's determination here. The prosecutor's questions were directed at determining whether, given an opportunity, the particular juror would always select life imprisonment over the death penalty. Defendant is correct in asserting that California law does not give jurors unlimited discretion in how they are to vote. However, it is equally clear that jurors ultimately must select between two options once the penalty phase is reached. The prosecutor properly inquired whether, if they had such a choice, the jurors would automatically reject death as an appropriate penalty. In each instance the juror affirmed that he or she not only "thought" he or she could not, but definitely could not, vote to impose death.

On each occasion, the prosecutor's questioning, followed by the court's own rehabilitation, was directed at determining whether the juror unequivocally would refuse to impose the death penalty if another option existed. Each juror unqualifiedly stated he or she would not vote to impose death. No objections were raised to any of the questions, nor do we find that they in any way mischaracterized the role that a juror must play during the penalty phase. Jurors do have a choice and counsel and the court are entitled to determine whether a prospective juror will properly consider both potential penalties or will instead always impose one or the other.

■■■ Defendant's remaining challenge to the jury selection process is that the court erroneously failed to excuse a juror who indicated that she would always vote for the death penalty if the special circumstances were found to be true. Hazel Caldwell indicated during questioning by the defense counsel that if the facts as alleged were proven "I wouldn't hesitate to vote for a death penalty if I could see no other way out." In that respect, "about the only way out would be if there's something come up that proved

that there was some evidence that had been presented that was untrue and that he wasn't as guilty as they claim." Even if it were shown that "he was a nice boy or he had some emotional problems" that would not change her mind. The prosecutor then took the court's invitation to examine and explained that there would be two trials for her attention. He stressed that at the second phase the issue of defendant's guilt would not be in issue. At that point the question would be the choice of penalty only.

Caldwell stated she would want to listen closely before ever voting for death and would make up her own mind. The court then reiterated the distinction between the two phases of a capital case and explained that they wanted to assure that if the case got to the penalty phase "you will go into the second phase, the penalty phase, with an open mind and perfectly willing to come back with either life imprisonment without the possibility of parole or death, depending upon the evidence that's presented there." The court then inquired "Can you do that?" and the juror answered "Absolutely." Defense counsel did not pursue further examination and instead renewed his challenge on the ground that Caldwell had indicated on several occasions she would always vote for the death penalty unless it were shown during the second phase that defendant might not be guilty. The court observed that Caldwell had indicated during further questioning that those statements had been made due to a misunderstanding and again confirmed through questioning that the juror would not be "locked in" on the death penalty even if defendant were found guilty.

As in the previous instances discussed, the purpose of the questioning was to clarify the juror's state of mind. Caldwell, after having the purposes of the two phases explained to her by defense counsel and the court, repeatedly asserted that she would approach the penalty phase with an open mind and would not automatically vote for death. Under the circumstances, the court acted properly in denying the challenge for cause.[17]

2. *Notice of Penalty Phase Evidence*

Section 190.3 mandates that "no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial. Evidence may be introduced without such notice in rebuttal to evidence introduced by the defendant in mitigation." ▮ Defendant complains that he was given untimely and inade-

---

[17] In addition, we note that defendant never asserts and the record does not show that he exhausted all of his peremptory challenges so that removal of Caldwell affected his ability to excuse peremptorily any other juror.

quate notice of the evidence in aggravation which the prosecution intended to introduce at the penalty phase.

On January 11, 1982, seven days before trial began, the prosecutor served defense counsel with a notice of evidence to be presented pursuant to section 190.3. This notice, filed with the court, listed: (1) the circumstances of the crime and any special circumstances found to be true, (2) defendant's felony record, (3) the death of a child in Michigan in 1967,[18] (4) "circumstances involving the Rumsey family, Fontana Police Officers and the Defendant" occurring around March 1981 and including evidence of threats and violence, (5) circumstances involving an attempted kidnapping in the Ontario area in 1975, (6) incidents in the San Bernardino County jail during which handcuff keys were located, (7) evidence of a plan by defendant to feign illness in order to escape, (8) evidence of defendant's attempts to solicit David Kent to kill certain witnesses, (9) evidence about defendant's testimony in another murder case, (10) testimony from Michigan doctors in whose opinion defendant was a violent person, (11) evidence relating to "Defendant's character, background and history as contained in the discovery," (12) evidence involving credit card forgery and stolen guns and defendant's threat of violence to an informant at an automobile dealership in Michigan, and (13) "Any and all other evidence of criminal activity by the defendant involving the use or attempted use of force or violence or which involved the express or implied use of force or violence contained in the approximately 1472 pages of discovery provided to date to Defendant or which may come to the attention of the prosecution at a later date."

In a motion heard on the morning of the second day of jury selection, January 19, defense counsel complained that the 13th item listed above was insufficient. The court responded that if the prosecution offered evidence which had not been specifically listed "he will have to justify to the Court why he didn't know about it at the time he presented that list to you. [¶] Now, if it's something he didn't know about and that he discovered later, probably depending on the situation, probably I would let it in." If, on the other hand, it were something the prosecution should have known about at the beginning, then, the court stated, it would not be allowed. The prosecutor agreed to this standard as did defense counsel. The prosecutor also stated that there was a large amount of discovery "and the only reason for putting that last phrase in there was in the event there's some incident that may have been overlooked in the discovery."

---

[18] The court later ruled this evidence could not be admitted because defendant's confession in the case had been suppressed and the case had been dismissed. Unable to ascertain whether the dismissal of the matter "with prejudice" was intended as a ruling on the merits under Michigan law, the court refused to admit the information.

The court ordered the prosecutor to give written notice of anything belatedly discovered, along with an explanation of how it had been found, and the prosecutor agreed. Defense counsel then stated he might have problems because some of the noticed activities occurred outside of California, and the court assured him "We will see to it that you are not put at an unfair advantage." Counsel responded "All right," and began discussing another topic. No further objections were made at this time to the adequacy of the notice and all participants appeared satisfied with the court's resolution.

A guilty verdict was rendered March 18. On March 19, certain defense motions relating to the penalty phase were heard. Defendant's first concern was about introduction of any evidence concerning the charge that had been brought against defendant relating to the murder of a baby in Michigan 15 years before. Next, defendant asked for an order of discovery and a list of every witness that the prosecution intended to call during the penalty phase. The court ordered the prosecutor to inform defendant by the end of the day of all the witnesses that he at that point "in good faith" intended to call.

On March 24, the parties appeared again to discuss the prosecution's list of 13 witnesses. Defense counsel reviewed the testimony expected from each witness. He observed that Deena Gibson and Linda Rumsey would be testifying as to various threats made by defendant.

The prosecutor then observed that three witnesses were there from out of state and asserted, without contradiction, that "Mr. Foley [defense counsel] has been aware of these particular factors, these particular events involving his client. He was put on notice, prior to the trial starting, that we intended to call these particular witnesses." He stated that Diane Leach would not be called because she refused to come voluntarily and they had been unable to go through the necessary process to subpoena her from out of state. In addition, a second originally named witness would also not be called.

Next, the court inquired into what criminal activity the prosecution intended to prove. The prosecutor mentioned that, in addition to the stealing of some guns, he would present "other evidence of the Defendant's use of firearms, threatening girl friends, wives, shooting at them——." Defense counsel objected only to the alleged theft on the ground that no previous notice of the incident had been asserted. The court stated it would not admit the evidence because defendant had been convicted only of misdemeanor theft and there was nothing indicating that theft of a gun was a crime of violence.

After discussion of various other items, the prosecutor stated that "In talking with these ladies [Gibson and Rumsey] yesterday after they came in

here, their life with him is complete [*sic*] with violence." Defense counsel observed there had been no reports given to him of such incidents, other than a previously discussed attempt by defendant to kidnap Gibson's baby. The prosecutor explained there simply were no reports of those matters and they had not come to his attention until 11 p.m. the previous evening during interviews with the witnesses. He reiterated that he had given the defense all information he had had before.

When defense counsel raised the question of notice, the court stated that it believed that the code required reasonable notice and that he sympathized with the defense's position and its need to investigate. He suggested first that he give a two-week delay for that purpose and defense counsel replied "All right" and turned to other matters.

The court ordered, at defendant's request, that the prosecution provide information about any felony convictions which the prospective witnesses may have suffered. Finally, at the end of the hearing, the prosecutor suggested that the whole case be put over three and one-half weeks until April 19. Defense counsel agreed that the date was satisfactory and the court so ordered. The court also emphasized that the record should be clear that "Defendant has had every reasonable opportunity to meet the evidence which is going to be presented." It therefore directed the prosecution to obtain all available discovery and provide it to the defense within a week to allow defendant two and one-half weeks to prepare. No objection to this procedure was raised. The court then set a status conference for April 14 and the parties agreed.

On the 14th, defense counsel referred to the prosecution's notice of March 24 concerning other criminal activity it intended to introduce. He represented that immediately after the hearing he spoke with Gibson and the following Monday he spoke with Rumsey for two and one-half hours. He then listed the numerous instances of violent criminal activity to which the two women would testify and asserted that he had not had sufficient notice on those items. In response to questions from the court, he conceded that he had first had notice on March 24.

The prosecutor then explained again that he had not talked with those witnesses until immediately before the March 24 hearing and had not realized the extent of Gibson's relationship to defendant before that time. The question of when notice should be given was discussed, and the prosecutor conceded that he had the duty to notify defendant of any information he had before the guilt phase began. The court questioned whether the duty should relate to anything the prosecution could have known about and the prosecutor reminded the court that it was his understanding that the pur-

pose of the continuance of the penalty phase had been to allow defendant time to prepare. The court then reviewed the original notice and observed that there had been notice of incidents involving Rumsey at least around March 1981, but opined that the other "catchall" phrases did not give sufficiently specific notice.

The court observed, however, that the purpose of the continuance had indeed been in part to give the defense a chance to investigate the probable testimony of the two women. The court then reviewed the code section, and noted more specific notice had not been given before March 24 because of the prosecutor's lack of awareness. It then concluded that in the present context the term "before trial" meant before the penalty phase and that the question then became "whether or not this is a reasonable time prior." He expressed interest in whether the defense had a reasonable time to prepare, again cited the fact of the long continuance, and then asked defense counsel to speak to the issue of whether he had enough time or required more.

Counsel stated that the list of incidents covered a period of seven to nine years and the prosecutor had not informed him which ones would be introduced or if all of them would be. On that basis he claimed, "I don't think it's adequate notice." The court responded that in view of the prosecutor's comments at the March 24 hearing *and* defense counsel's extended interviews with the women in which he obtained the details, sufficient notice had been given. The prosecutor also commented that he was present during the interviews and that, as defense counsel agreed, he at times specifically asked the witnesses to describe particular incidents, and told them to give as much detail to defense counsel as they had to the prosecutor and anything additional that had come to mind.

The court found that specific notice to defendant came from the interviews themselves over three weeks before the penalty phase was to start. Defendant still protested there was too much to do and the court then asked for suggestions. Defense counsel stated: "My suggestion is that the Court not admit [the evidence]," but never asked for additional time. The court ruled that the women's testimony would be admissible.

The evidence challenged here was utilized during the penalty phase to a significant degree. Nevertheless, assuming arguendo that the notice given by the prosecutor prior to the penalty phase was untimely and that, as defendant urges, notice must be given before the guilt phase commences, we find no prejudicial error. First, the trial court gave defense counsel a reasonable opportunity to prepare to meet the new evidence and until the last hearing

counsel fully agreed with all the procedures utilized.[19] There was no showing of bad faith by the prosecution in its timing of the notice of this evidence or claim of such misconduct by the defense. The prosecutor explained that he had been unaware of the existence of the evidence until immediately prior to the first hearing following the guilty verdict.

At the time, defense counsel did not indicate any prejudice in terms of preparation for the guilt phase. On appeal, however, he asserts that there was prejudice because defense counsel was deprived of an opportunity to take into account penalty phase evidence at the time of jury selection. Moreover, he contends that notice of this evidence may have been relevant to defendant's decision to testify.

We find these arguments without merit because of the nature of the evidence as to which defendant received pretrial notice. The prosecution gave preguilt trial notice of its intention to produce evidence regarding a charge of murder of a small child levied against defendant in Michigan. That evidence was the subject of much postguilt and prepenalty phase discussion and eventually was ruled inadmissible. Whatever the ultimate postguilt phase disposition of this particular issue, defendant knew before the guilt phase that his alleged violent conduct toward a child might be introduced by the prosecution during the penalty phase.

Similarly, defendant was advised before the guilt trial that the prosecution would seek to present evidence of the "circumstances involving the Rumsey family, Fontana Police Officers, and defendant" in 1981, which included evidence and threats of violence to a former girlfriend. This information, as well as notice that the circumstances of the alleged kidnapping involving his children and Deena Gibson in 1975 would be offered, alerted defendant to the fact that evidence of his violent conduct towards women with whom he had had relationships and towards their children would be presented at the penalty phase. Defendant does not explain why counsel failed to suggest before the trial court that in fact his conduct of the guilt phase and jury selection would have been different and to urge this as a basis for not allowing the evidence. Moreover, he offers no theory explaining why the notice of evidence which had been given before trial did not sufficiently alert him and his counsel to the kinds of evidence which might be presented. The *amount* of evidence was expanded by the postguilt phase information; the *nature* of that evidence was not changed. Thus, there was

---

[19] In his supplemental brief, defendant argues that the court should have selected an alternative remedy suggested by trial counsel, namely selection of a new jury for the penalty phase. This request for a new jury was first made and determined before trial during voir dire and renewed *before* the effect of the additional penalty phase evidence was discussed in court. It was not raised again during the discussions of the notice problem.

no prejudice, because before jury selection and the guilt phase defendant and counsel were fully aware that defendant's violent conduct towards women and children might well be presented at the penalty phase. The potential presentation of such evidence was already in mind at the time jury voir dire was undertaken and guilt phase tactics were selected.

As to prejudice because of timing per se, the court offered to listen to suggestions from counsel on how to deal with the problem even after affording defendant a three-and-one-half-week continuance in order to explore the evidence. Counsel's only suggestion was to bar the evidence in its entirety. He did not request additional time to prepare; rather he seemed to indicate that the evidence was so abundant that under any circumstance it would be impossible to combat it.

We believe that the statutory purpose of advising an accused of the evidence against him in order to afford him a reasonable opportunity to prepare his defense at the penalty trial was met under the conditions here. Defendant was given specific notice of the evidence as soon as the prosecutor was aware of its existence. He was given extra time to prepare and never requested more. The fact that the violent incidents were numerous does not provide a basis for finding them inadmissible. We therefore conclude that even though the notice was not given until after the guilt phase had terminated, any error which may have occurred was not prejudicial nor was it reasonably possible that the penalty verdict was affected.

3. *Constitutionality of Section 190.3, Subdivision (b)*

Relying on out-of-state cases, defendant argues that the admission of evidence of unadjudicated criminal activity during the penalty phase is unconstitutional. Section 190.3, subdivision (b), provides that the jury may take into account in deciding penalty "The presence or absence of criminal activity by the defendant which involved the use of force or violence or the express or implied threat to use force or violence." We rejected a similar claim that "due process precludes a 'guilt' jury from hearing 'other crimes' evidence at the penalty phase" in *People* v. *Balderas* (1985) 41 Cal.3d 144, 204 [222 Cal.Rptr. 184, 711 P.2d 480].

As we recently stated, "The plain meaning of subdivisions (b) and (c) [relating to prior felony convictions] of section 190.3 is that the jury must consider any *violent* criminal activity by the defendant, whether or not it led to prosecution and conviction . . . ." (*People* v. *Balderas* (1985) 41 Cal.3d 144, 201, fn. omitted.) Defendant's argument here is also premised on the "need for safeguards including unanimity of verdict and written findings that 'other crimes' were proved beyond a reasonable doubt." As discussed

hereafter, the jury was instructed that it must find unanimously and beyond a reasonable doubt that the crimes described during the penalty phase occurred. Moreover, as we explain, defendant did not request an instruction defining the elements of the crimes, and as we have previously held, the trial court has no sua sponte duty to so instruct. Thus, defendant cannot be heard to complain on appeal. (See *People* v. *Phillips* (1985) 41 Cal.3d 29, 72-73, fn. 25 [222 Cal.Rptr. 127, 711 P.2d 423].) Here, some of the "safeguards" described as necessary were utilized, and defendant made no request for additional instructions or delineation of the jury's use of the evidence. No basis for reversal on this ground appears.

### 4. *Admission of Aggravating Circumstances Evidence*

(a) *Burning of Gibson's son.* Deena Gibson testified on direct examination that defendant took her three-and-one-half-year-old son to the bathroom, placed a towel over the boy's head and used a can of hairspray and a lighter as a torch to burn his genital area because he had wet the bed. No objection was made to this testimony. On cross-examination, Gibson stated she had not seen the incident, but that her son had told her of it. She also stated that his genital area was red with a little blistering as a result of the incident. Counsel's objection and motion to strike on the ground that the evidence was hearsay was overruled.

The next day counsel moved for a mistrial on the same ground and because he claimed the evidence was not sufficient to convict defendant of a crime. The court denied the motion, stating it believed the jury had gotten "the entire picture. [¶] They got the testimony from the mother as to what she saw, which was very mild in the way of reddening and slight blistering; *that the three-and-a-half-year-old child immediately told her what had happened;* that she then confronted the Defendant with that and he denied it."

In addition to Gibson's testimony, Linda Rumsey, who was living with Gibson and her son and defendant at the time, stated that she was directly outside the bathroom door and heard the sound of an aerosol can being sprayed accompanied by screaming from Gibson's son. She knew that defendant and the boy were in the bathroom although she did not know if anyone else was there.

Defendant voiced no challenge to the evidence when it was first introduced on direct examination. Objection came only during cross-examination. Accordingly, we could conclude that the objection was waived because not timely made. Nonetheless, the manner in which the evidence was elicited on direct examination made the source of Gibson's knowledge of the event unclear, so that answer appears insufficient.

██ Defendant also contends that the evidence was admitted by the court only to show "callous and vicious acts" by defendant but not to show actual criminal activity. It is clear, however, that the incident fell squarely within the definition of subdivision (b) of section 190.3, namely, it showed "criminal activity . . . which involved the use of force or violence . . . ."

The parties contest whether the statement by the boy was properly admitted as a spontaneous declaration. Evidence Code section 1240, subdivision (b) provides a statement may be admitted if it "was made spontaneously while the declarant was under the stress of excitement caused by such perception." As defendant argues, however, there is really no foundation for this exception, because there was no indication of when and under what circumstances the boy told his mother what had happened. The timing of the statement was not made clear. However, even without the declaration, there was evidence of the injury to the child and of defendant's presence in the bathroom as the child screamed.

In any event, although defendant characterizes this evidence as "perhaps the ugliest incident to be spoken of during appellant's penalty phase," in addition there was properly admitted evidence that defendant, among other violent acts, forced the same child to drink a cup of urine because he had wet the bed, placed a lighted cigarette between the boy's fingers causing a burn, beat the boy in the face causing bleeding from the mouth and nose, hit his nine-year-old son in the stomach with a closed fist, and engaged in assorted forms of assaultive behavior on other children as well as Rumsey, Gibson and Leach. In light of the other evidence of injuries inflicted by defendant on children as well as adults, any error in admitting the evidence at issue was harmless under any standard.

(b) *Possession of the handcuff keys.* ██ Defendant argues that the trial court erroneously admitted evidence of defendant's possession of handcuff keys while in jail on the ground that the possession did not involve use or implied threats of violence or force. Defense counsel objected to this evidence during the hearings before the penalty phase commenced, but the trial court overruled the objection on the ground that the "end purpose of the key and the getting out of the handcuffs is an escape from custody . . . . This necessarily implies a confrontation between the Defendant now out of the handcuffs and the officers, and is certainly filled with the potential for violence."

We have previously ruled, as defendant asserts, that escapes, in and of themselves, are not necessarily inherently dangerous. (See *People* v. *Lopez* (1971) 6 Cal.3d 45 [98 Cal.Rptr. 44, 489 P.2d 1372].) We observed that "The possibility of violence during an escape can become an actuality only

when, under the facts of the particular case, the escapee attempts violent resistance or, in his efforts to elude capture, conducts himself in a reckless manner." (*Id.* at p. 52.) Thus, we concluded, "The fact that such reactions do occur in some cases is not sufficient to support the conclusion that one who escapes from legal confinement thereby creates a situation inherently dangerous to human life." (*Ibid.*)

Subdivision (b) of section 190.3 permits evidence of "[C]riminal activity by the defendant which involved . . . the express or implied threat to use force or violence." Arguably, under the circumstances, the possession of the handcuff key and its implied intended use to permit defendant to free himself from handcuffs, normally worn during defendant's transportation in the custody and presence of law enforcement personnel, constituted criminal activity which posed an "implied threat" to use force or violence. There is no requirement that actual violence or force be used. We need not decide the admissibility of this evidence, however, because in view of the overwhelming additional evidence of violent activity, any error in permitting it had no effect on the verdict.

(c) *Cross-examination of defendant's sister.* ▮▮▮ Defendant asserts that the trial court improperly permitted the prosecution to ask questions on cross-examination of defendant's sister, Judy Carter, which went beyond the scope of the direct examination. On direct examination, Carter testified that Rumsey beat her children, which upset defendant; that Rumsey hit defendant's mother and fought with the witness; and that defendant never mistreated babies, his mother or his son Gary, Jr. During cross-examination, the prosecutor asked if Carter and her husband had assisted Gary, Jr., to escape from the juvenile court's jurisdiction whether she had been arrested for harboring a fugitive after officers had come to her home looking for defendant, and whether defendant had continuously carried a gun.[20]

As the trial court observed, the issues involved constituted "a legitimate attack on credibility." Evidence showing a witness's bias or prejudice or which goes to his credibility, veracity or motive may be elicited during cross-examination. (Witkin, Evidence (2d ed. 1966) Introduction of Evidence at Trial, §§ 1229-1236, pp. 1135-1141.) The questions objected to here were just such inquiries and there was no error in the trial court's overruling of defendant's objections thereto.

(d) *Rebuttal evidence by Diana Bracken Leach.* During rebuttal, the prosecution called Ms. Leach to testify concerning acts of violence commit-

---

[20] In fact, although there had been an objection to a question which dealt with defendant's use of a gun, the prosecutor withdrew the question and rephrased it, and there was no objection to the newly formulated question.

ted by defendant. ██ Defense counsel objected on the ground that he had received no prior notice of the acts described and the evidence was improper rebuttal.

Section 190.3 provides that no notice need be given for evidence presented in rebuttal. Defendant cites Justice Mosk's statement in his dissent in *People* v. *Jackson* (1980) 28 Cal.3d 264, 333 [168 Cal.Rptr. 603, 618 P.2d 149], that "it is improper for the prosecution to deliberately withhold part of its case in chief until the rebuttal; the latter is restricted to evidence that is made necessary by the defendant's case, i.e., is responsive to proof introduced by the defendant that is not implicit in his denial of guilt. [Citations.]" He contends that such a situation occurred here and the prosecution improperly withheld evidence during its case-in-chief and presented material in rebuttal beyond the scope of issues raised by defendant's case.

As part of the defendant's case-in-chief during the penalty phase, defendant's sister Judy Carter testified that defendant never spanked children before they were five or six years old and she had never seen him mistreat any child. She specifically stated she had never seen defendant abuse his son Gary, Jr., nor had Gary, Jr., complained to her of any mistreatment.

Defendant also testified and denied physically mistreating Gibson's son or Gary, Jr. During cross-examination, he stated he did not telephone Leach on November 9, 1981, and threaten that when he was released from jail he would kill Billie Bracken and Teri Howard. He further testified that he had never threatened Leach with a weapon while they lived together. Instead, he claimed, she shot him with a BB gun. He also denied ever threatening to send her a bomb through the mail. Defense counsel objected to a question by the prosecution during cross-examination, asking whether defendant had threatened Leach while they were living together, on the ground that Leach was not available to testify. The prosecutor answered that he had just made arrangements for her to come for the trial, and no further relevant objections were lodged nor were any objections except as described hereafter raised to any other part of the testimony elicited during rebuttal.

When Leach was called to testify, defense counsel objected on the ground that he had not been given previous notice of the alleged criminal activity which the prosecution intended to present. The court found that a portion of the evidence not concerning the children had been made known to defendant previously, and that in any event the evidence was proper rebuttal which the prosecution had discovered in the course of its preparation for that stage of the presentation of its case.

Leach testified that defendant had threatened Teri Howard and Billie Bracken and that while they lived together he had threatened Leach with a gun and a knife. He also threatened to kill his three children by Linda Rumsey. Leach also stated she had seen defendant mistreat the three children by hitting them in the back with boards. The children ranged from around three and one-half to six years of age at the time. She also observed defendant take the youngest child and hang him by a belt from a nail in the basement for approximately 15 minutes as punishment because the child would not go to sleep, and saw defendant choke his son Gary, Jr., and hit him in the stomach with his fist. Finally, Leach stated that defendant threatened over the telephone to mail her a bomb. Each incident testified to was directly related to testimony in defendant's case-in-chief during the penalty phase.

All of the evidence elicited was proper rebuttal to the testimony presented during defendant's case. Leach's testimony related to the specific acts denied by defendant or rebutted his sister's claims that he never mistreated children. Even assuming no notice had been given of all the evidence, no error appears, because section 190.3 specifically excepts rebuttal evidence from the notice requirement.

(e) *Admission of Dr. Flanagan's testimony.* On the day after his arrest, defendant asked a deputy district attorney to obtain a doctor for him to talk to because he had been "shooting drugs" which had messed him up and he was "coming down."[21] At the district attorney office's request, Dr. Richard Flanagan, chief psychiatrist for the California Institution for Men at Chino, went to the San Bernardino County jail to interview defendant. Before the interview occurred, a police detective advised defendant of his *Miranda* rights; he acknowledged that he understood his rights and stated that he wished to speak with Dr. Flanagan.

Although defendant denied the following, the court found, based on testimony by the doctor and the officer, that defendant had freely and voluntarily waived his constitutional rights, and that the doctor advised defendant who he was, that he was there at the district attorney's request, and that he would prepare a report for the district attorney and there thus would be no confidentiality regarding the interview. The court therefore permitted the doctor to testify, inter alia, that defendant had told him he had been kicked out of school in the eighth grade for hitting a teacher over the head with a chair, that he had frequently beaten his wife Linda, and that he had been fighting with his current live-in companion.

---

[21] No diminished capacity or other mental defense was raised at any point.

 Relying on *In re Spencer* (1965) 63 Cal.2d 400 [46 Cal.Rptr. 753, 406 P.2d 33], defendant contends that the testimony was erroneously admitted. In *Spencer* we held that the defendant had been denied his right to counsel when the court-appointed psychiatrist testified at the guilt phase to statements made by the defendant during a psychiatric interview. *Spencer* is distinguishable, however, because the defendant had not been advised of nor had he waived his constitutional rights before speaking to the court-appointed psychiatrist. (See *id.* at pp. 410-411.) In contrast here, defendant was advised of his rights and the court found he had freely and voluntarily waived his rights. Moreover, Dr. Flanagan was there at the district attorney's behest following defendant's request, rather than through court appointment. Thus *Spencer* provides no assistance to defendant on this basis.

Defendant also argues that the testimony was improperly admitted because, as stated in *Spencer,* "If defendant does not offer evidence of his mental condition at the penalty trial, the court-appointed psychiatrist may not, of course, testify at trial." (63 Cal.3d at p. 412, fn. 10.) The testimony of the psychiatrist here, however, did not relate to defendant's mental condition. Instead, the evidence involved particular acts of violence which defendant had described to the doctor. Thus, the prohibition in *Spencer* is further inapplicable because it was not an improper attempt by the prosecution to bring defendant's mental condition into issue.

Defendant next argues that the testimony was barred by Evidence Code section 1010 which sets forth the psychotherapist-patient privilege. However, defendant's argument again must fail because, as the trial court specifically observed, defendant was informed that the interview was *not* confidential and that a report would be made to the district attorney. Under those circumstances, defendant's participation in the ensuing interview could not be found to have somehow recreated the privilege thus rendering his statements confidential.

Finally, defendant specifically objects to Dr. Flanagan's statement on rebuttal that defendant had told him that when he was in eighth grade he was kicked out of school for hitting a teacher on the head with a chair causing an injury requiring stitches. During cross-examination of defendant, the prosecutor had asked whether defendant had in fact been kicked out of school for such a reason, and defendant had denied the assertion. Despite defendant's claim to the contrary, the evidence was admissible as proper rebuttal because it went to an issue raised during examination of defendant. Moreover, as previously discussed, pursuant to section 190.3, subdivision (b), the prosecution was not required to give notice of the information, because it was presented during rebuttal.

Defendant also argues that the evidence should not have been admitted because it concerned an act occurring when defendant was a juvenile. Again, no objection was lodged on this ground, and no basis for reversal therefore appears.[22]

## 5. *Penalty Phase Instructions*

### (a) *Instructions on sympathy and mitigation.*

(i) *"Sympathy" instructions.* Defendant asserts that during sequestered voir dire the court erroneously instructed six of the jurors who were eventually selected that they were not to consider sympathy. This so-called "instruction" was in fact a question. The court, using essentially the following language, explained "These trials always bring out feelings of some sort or the other in the people who hear the evidence, feelings of sympathy or passion or prejudice or whatever. [¶] Would you be willing to put such feelings aside and determine the issues just on the evidence?" Each juror responded that he could. No objection was raised by defense counsel to the questions.

 Based on these inquiries, defendant now contends that the court erroneously instructed the jurors regarding the scope of their consideration of mitigating evidence by telling them to "put aside" feelings of "sympathy." Although this argument may have been tenable under former cases (see *People* v. *Brown* (1985) 40 Cal.3d 512, 537 [230 Cal.Rptr. 834, 726 P.2d 516]), it no longer has merit in light of intervening authority. The United States Supreme Court, reviewing our opinion in *Brown,* recently held that such an instruction is not, in and of itself, error. (*California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934].) The high court held that our *Brown* opinion had "improperly focused solely on the word 'sympathy'" in the instruction. (479 U.S. at p. 540 [93 L.Ed.2d at p. 939, 107 S.Ct. at p. 839]). A plurality of the court concluded instead that the instruction was intended to mean, and would be understood by the jurors to mean, that they were "to ignore only the sort of sympathy that would be totally divorced from the evidence adduced during the penalty phase." (*Id.* at p. 542 [93 L.Ed.2d at p. 940, 107 S.Ct. at p. 840].) Justice O'Connor, in her concurrence, agreed "that [a no-sympathy] instruction . . . does not by itself violate the Eighth and Fourteenth Amendments to the United States Constitution. At the

---

[22]*People* v. *Weidert* (1985) 39 Cal.3d 836 [218 Cal.Rptr. 57, 705 P.2d 380], does not apply. There, we held that killing a witness in a juvenile proceeding was not a basis for finding true the special circumstance that the victim was a witness in a "criminal proceeding." The admissibility of evidence such as that at issue here was not addressed, and, in any event, as noted, in the present case no objection was made on this ground when the issue first arose during defendant's testimony.

same time, the jury instructions—taken as a whole—must clearly inform the jury that they are to consider any relevant mitigating evidence about a defendant's background and character, or about the circumstances of the crime." (*Id.* at p. 544 [93 L.Ed.2d at p. 942, 107 S.Ct. at p. 841], see also p. 540 [93 L.Ed.2d at p. 939, 107 S.Ct. at p. 839].) The key inquiry then is to ascertain whether jurors have been "misled into believing that mitigating evidence about a defendant's background or character . . . must be ignored." (*Id.* at pp. 545-546 [93 L.Ed.2d at p. 942, 107 S.Ct. at p. 842].)

We cannot conclude that this jury was so misled. First, the court's statements during voir dire were in question form. Second, and most importantly, the jury, although properly instructed not to consider sympathy during the guilt phase, *was* instructed at defendant's request at the penalty phase that "In this part of the trial, *the law does not forbid you from being influenced by pity for the defendant.* However, the law does forbid you from being governed by mere conjecture, prejudice, passion, or public opinion." (Italics added.) During his penalty phase closing argument the prosecutor also stressed that although in the first phase the court had instructed the jurors "that you were not to make a determination based on sympathy, passion, public opinion, public feeling, things of that nature—pity. [¶] *This is different. In this part of the trial, the law does not forbid you from being influenced to pity—or by pity for the Defendant.* [¶] However, the law does forbid you from being governed by mere conjecture, prejudice, passion or public opinion." (Italics added.)

In addition to the above instruction and argument, the jury was told that "Aggravating circumstances are circumstances attending the commission of a crime which increases [*sic*] its guilt or enormity or adds [*sic*] to its injurious consequences, but which is [*sic*] above and beyond the essential constituents of the crime itself. [¶] Mitigating circumstances are circumstances which do not constitute a justification or excuse of the offense in question, but which, *in fairness and mercy,* may be considered as extenuating or reducing the degree of moral culpability." (Italics added.) Thus the jurors, in addition to being informed expressly that they could consider "pity," were instructed that they could consider matters which "in fairness and mercy" could be found extenuating.

The jury here was specifically informed that consideration of all mitigating factors and any sympathy aroused for defendant was appropriate to its penalty determination. Nor do we find compelling defendant's argument that "pity" and "sympathy" are not essentially the same and an instruction as to one does not cover the other. The language used in the instruction was that posed *by defendant.* The instruction, as well as the argument by the prosecution, stressed the distinction in the jury's role at the penalty phase

from that at the guilt phase by explaining that the instruction given at the guilt phase was inapplicable.[23] The emphasis on the difference in instructions clearly related to the fact that in the second phase the jurors *could* consider pity or sympathy; the two terms were essentially synonymous as used here.

(ii) *CALJIC No. 8.84.1.* In a related argument, defendant asserts that the use of CALJIC No. 8.84.1, which quotes the statutory list of aggravating and mitigating circumstances and, in particular, recites the unadorned version of factor (k), requires reversal. As noted, the jury was instructed that "Mitigating circumstances are circumstances which do not constitute a justification or excuse of the offense in question, but which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability." Thus, not only was the jury affirmatively informed that it could consider "pity," it was also instructed that it could take into account factors mitigating "the degree of moral culpability" of the defendant. The reference was not specifically to defendant's moral culpability regarding *the crime* alone. It invited the jury to consider evidence which "in fairness and mercy" decreased the *moral blameworthiness* ascribable to defendant. Moreover, the prosecutor did not attempt impermissibly to confine the jury's consideration of mitigating factors to those that "related to the crime itself." (*People* v. *Davenport* (1985) 41 Cal.3d 247, 284 [221 Cal.Rptr. 794, 710 P.2d 861].) We conclude the instructions and counsels' arguments described above sufficiently "fleshed out" the language of factor (k) and made clear to the jury it could consider mitigating factors beyond those relevant only to the crime itself.

In sum, viewing the instructions given and the arguments of counsel as a whole, we find that the jury was properly instructed regarding its role. The specific instructions and the arguments of counsel assured that the jury was not misled as to the factors which it could consider in determining the appropriate penalty. No error occurred.

(b) *The so-called "mandatory" aspect of the 1978 law.* The jury was instructed in the language of former CALJIC No. 8.84.2 as follows: "If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death." Defendant claims that the jury was thereby misled as to its role in determining the appropriateness of the death penalty in this case.

In *Brown,* we explained "that a statute would be invalid if interpreted to preclude juror consideration of any factors constitutionally relevant to im-

---

[23]That instruction stated that "You must not be swayed by mere sentiment, conjecture, *sympathy,* passion, prejudice, public opinion or public feeling." (Italics added.)

position of the death penalty. Nor would a statute pass muster if it required jurors to render a death verdict on the basis of some arithmetical formula, or if it forced them to impose death on any basis other than their own judgment that such a verdict was appropriate under all the facts and circumstances of the individual case." (40 Cal.3d at p. 540, fn. omitted.) We concluded that the 1978 law was not invalid under the cited standard.

We observed that "the word 'weighing' is a metaphor for a process which by nature is incapable of precise description. The word connotes a mental balancing process, but certainly not one which calls for a mere mechanical counting of factors on each side of the imaginary 'scale,' or the arbitrary assignment of 'weights' to any of them. Each juror is free to assign whatever moral or sympathetic value he deems appropriate to each and all of the various factors he is permitted to consider . . . . By directing that the jury 'shall' impose the death penalty if it finds that aggravating factors 'outweigh' mitigating, the statute should not be understood to require any juror to vote for the death penalty unless, upon completion of the 'weighing' process, he decides that death is the appropriate penalty under all the circumstances." (*Id.* at p. 541.) Each case must be considered on its own merits to determine whether the jury was misled to defendant's prejudice about the scope of its sentencing discretion and responsibility under the 1978 law. (*Id.* at p. 544, fn. 17.)

The jury here was properly informed of its discretion and responsibility by both prosecutor and defense counsel as well as in additional instructions. As set forth above, the jury was instructed that it could consider pity in mitigation and was also instructed that mitigating circumstances are factors "which do not constitute a justification or excuse of the offense in question, but which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability." In addition, the jury was specifically informed that "In weighing the aggravating and mitigating factors, *you are not to merely count numbers on either side. You are instructed rather to weigh and consider the factors. One mitigating circumstance may be sufficient to support a decision that death is not the appropriate punishment in this case.* [¶] *The weight you give to any factor is for you individually to decide.*" (Italics added.) Thus, the jury was expressly told that the "weighing" process called for under the instructions was *not* a mechanical counting process and was reminded "of its constitutional responsibility to decide what penalty is appropriate under all the relevant circumstances." (*People v. Brown, supra,* 40 Cal.3d at p. 544.) It was also made clear that a single mitigating factor could support a determination that death was not the *appropriate* penalty. Given these directions, we are confident that the jury understood, consistently with *Brown,* that its task was to determine whether death was "appropriate" for this defendant.

Neither the prosecutor's nor defense counsel's arguments would have diverted the jury from this proper understanding. In his argument, the prosecutor explained that the court would tell the jury to "go through a weighing process, strictly a simple weighing and balancing of the evidence, and you decide whether the factors in mitigation outweigh the factors in aggravation outweigh, by a little bit or a whole lot, the factors in mitigation." He continued: "And you don't count the number of items or the factors in mitigation and say that there were three or four or eight or ten and only one in aggravation, or the other way around. *You weigh those factors, and you give to those factors the weight that you feel they're entitled. And whichever way the scale tips, that determines the way that you go.*" (Italics added.)[24]

The overall focus of the prosecutor's argument was an appeal to the jury's responsibility to decide, through the exercise of its individualized weighing discretion, the appropriate punishment for this defendant. His last words to the jury well illustrate the prosecutor's correct premise. "This man *deserves* the death penalty. He's done a lot of things to *warrant* the death penalty. [¶] He has *earned and deserves* the death penalty, ladies and gentlemen, and I would ask you to return that verdict when you deliberate." (Italics added.)

In his closing argument, defense counsel similarly reminded the jury that "just one mitigating circumstance alone may outweigh all of the aggravating circumstances." His statements reemphasized the personal responsibility and judgment underlying the jury's sentencing discretion. The thesis of defense counsel's argument was that (1) the jury should show mercy, (2) others were equally culpable and hence defendant did not deserve to be singled out for the death penalty, and (3) each juror would have to live with

---

[24] Later the prosecutor repeated the words of the instructions to be given regarding weighing the various circumstances and stated that "if you conclude that the aggravating circumstances outweigh the mitigating circumstances you shall not—you may or can or, if you want to, conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death." Defendant attempts to "edit the punctuation for clarity" in his brief (no alteration having been made during correction of the record) by quoting the sentence as "If you conclude the aggravating circumstances outweigh the mitigating circumstances you *shall*—not you may or can, or if you want to—conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death." Neither version is a model of clarity.

The prosecutor also in the same portion of argument explained "Everything that you heard in that guilt phase, everything you have heard in the penalty phase . . . you put into the scale and you decide which side outweighs the other. [¶] If the factors in aggravation outweigh, you receive death. [¶] If the factors in mitigation outweigh, you receive life without possibility of parole." Note that there was no limitation placed on appropriate evidence for consideration.

Any potential problems arising from parts of the quoted language were cured by the overwhelming thrust of the prosecutor's argument which stressed the jury's role in determining the appropriate penalty.

his or her personal sentencing decision. Again, the thrust of the argument was premised on each juror's authority and responsibility to exercise independent judgment regarding the appropriate punishment for this defendant.

Under the circumstances here, and in view of the instructions and arguments presented to the jury, we are confident under any standard that no reasonable jury would have been in doubt about the individualized nature of the weighing process required of it, or its discretion and responsibility to determine the appropriate penalty. (See *People* v. *Allen* (1986) 42 Cal.3d 1222, 1276-1280 [232 Cal.Rptr. 849, 729 P.2d 115].)

(c) ■■ ■■ ■■ ■■ *"Other crimes" evidence.*[25] As indicated above, at the penalty phase the People introduced substantial evidence of other assertedly criminal conduct by defendant. During closing argument, both defense counsel and prosecutor discussed this evidence. The district attorney briefly touched upon some of the crimes that the evidence arguably demonstrated. Defense counsel observed that there had been no felony convictions based on the conduct described, and stressed that as to each of the possible crimes, the jury should recall "if you are going to consider any one of them, all of you have to agree that that particular thing has been proved beyond a reasonable doubt."

Following argument, the court instructed the jury and included directions on how to consider evidence of other crimes allegedly committed by defendant. Specifically, the jurors were told that "The People have introduced evidence of crimes allegedly committed by the defendant other than those for which he has already been convicted in this trial. Such evidence pertains to factors in aggravation. *You are not permitted to consider such evidence as a factor in aggravation unless you find unanimously and beyond reasonable doubt that the defendant committed said crime or crimes."* (Italics added.)[26] The jurors were also instructed in the words of section 190.3,

---

[25] Defendant claims that the court erred by not sua sponte instructing the jury on the elements of other crimes described during the penalty phase by various witnesses. We rejected such a claim in *People* v. *Phillips, supra,* 41 Cal.3d 29, 72, fn. 25.)

[26] The jury was given additional relevant instruction as follows: "[¶] You may not find as a factor in aggravation that the defendant committed a criminal offense unless there is some proof of the crime independent of any (confession or) admission made by him outside of this trial."

The jury was also told that, although it could rely on circumstantial evidence: "[¶] You may not find that the defendant committed any crime based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant has committed the crime, but (2) cannot be reconciled with any other rational conclusion. [¶] *Further, each fact which is essential to complete a set of circumstances necessary to establish that the defendant committed a crime must be proved beyond a reasonable doubt.* In other words, before an inference essential to establish that the defendant committed a crime may be

including subdivision (b), which provides that the trier of fact may take into account "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."

██ Defendant urges, in supplemental briefing, that our holding in *People* v. *Boyd* (1985) 38 Cal.3d 762, 772-776 [215 Cal.Rptr. 1, 700 P.2d 782], controls and requires reversal here. In *Boyd*, we considered the permissible scope of evidence which may be introduced pursuant to factor (k) of section 190.3. As we noted above, that factor permits the trier of fact to consider "any other circumstance which extenuates the gravity of the crime." We concluded that, under its terms, a defendant has an open-ended opportunity to present mitigating evidence for the jury's consideration. This invitation is not, however, extended to the prosecution to permit it to offer additional evidence beyond those factors otherwise specifically enumerated in section 190.3. "Consequently the prosecution's case for aggravation is limited to evidence relevant to the listed factors exclusive of factor (k)— since that factor encompasses only extenuating circumstances and circumstances offered as a basis for a sentence less than death—while the defense may present evidence relevant to any listed factor including (k)." (38 Cal.3d at pp. 775-776.) Defendant argues that the prosecution here erroneously introduced evidence which merely showed a propensity to commit violent acts.

The evidence presented, however, was primarily introduced under the aegis of section 190.3, subdivision (b), relating to other violent criminal activity. No objection was raised to introduction of the evidence on the grounds now urged. The portion of the arguments of both counsel which related to the criminal-activity evidence was presented in terms of evidence of crimes committed rather than as evidence of a general propensity to commit violent acts.

Finally, defendant makes no effort to differentiate evidence admissible under subdivision (b) and the evidence assertedly admitted under a mistaken interpretation of factor (k). If, in fact, any evidence was improperly admitted, we believe that any error was harmless. The jury was instructed that in order to consider as aggravating factors any evidence of violent criminal activities it must first find beyond a reasonable doubt that a crime had occurred. Defendant points to no instruction which would have vitiated the force of the ones quoted above and instead given the jury the impression that it could consider the evidence introduced merely as an overall indicator

---

found to have been proved beyond a reasonable doubt, each fact or circumstance upon which such inference necessarily rests must be proved beyond a reasonable doubt." (Italics added.)

of defendant's general criminal propensities. Nor does he point to any argument by the prosecutor advancing this proposition.

Under the circumstances, we discern no error. Nor, in any event, does defendant demonstrate any possible prejudice.

(d) *Failure to give proposed instructions.* Defendant contends that the trial court erroneously refused to give a requested instruction circumscribing the factors in aggravation which the jury could consider and specifically citing facts in mitigation for the jury's review.[27] The court rejected the instruction on the ground "part of it is covered in other Instructions and part of it would involve my selecting certain specific items and emphasizing those to the jury, which I felt would be improper." Defendant challenges both grounds. As to the first, he claims that it was erroneous because none of the instructions given stated that the jury could not take into account aggravating circumstances which were not delineated by CALJIC No. 8.84.1 when considering penalty.

In *People* v. *Boyd, supra,* 38 Cal.3d 762, we found that the 1978 law, "By . . . requiring the jury to decide the appropriateness of the death penalty by a process of weighing the specific factors listed in the statute, . . . necessarily implied that matters not within the statutory list are not entitled to any weight in the penalty determination." (*Id.* at p. 773, fn. omitted.) We therefore concluded that the prosecution was not entitled to introduce "[e]vidence of defendant's background, character, or conduct which is not probative of any specific listed factor . . . ." (*Id.* at p. 774.)

In *Boyd,* the court then looked to factor (k) of section 190.3 which describes as a relevant factor for the penalty jury's consideration "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." In *People* v. *Easley* (1983) 34 Cal.3d 858, 878-879 [196 Cal.Rptr. 309, 671 P.2d 813], footnote 10, we had directed courts to instruct on that factor by adding to the statutory language the following: "and any other 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.' "

---

[27] Defendant's requested instruction stated: "I have previously read to you the list of circumstances which the law permits you to consider if you find that any of them is established by the evidence. Those are the only circumstances that you may consider in aggravation. You are not allowed to take account of any other fact or circumstance as the basis for deciding that the death penalty would be an appropriate punishment in this case. [¶] The law permits you to consider those same circumstances in mitigation. In addition to those circumstances you may also consider in mitigation, evidence relating to the plea bargain entered into between the District Attorney and Joy Stevens, the evidence relating to the charges filed against Tony Lemock and the recent amendment to those charges, evidence relating to the cooperation given by the defendant to the Sheriff's office in the Pensinger and other cases."

In *Boyd,* we expanded on *Easley,* explaining that our reasoning in the earlier case "necessarily presumes that the jury can only consider evidence that bears upon a listed factor." (38 Cal.3d at p. 775.) On the one hand, the jury is "permitted to consider any aspect of defendant's character or record that he offers as a basis for a sentence less than death. There is no requirement that it also be permitted to consider any aspect the prosecution may offer as a basis for inflicting the death penalty." (*Ibid.*)

The court concluded that the prosecution might therefore be limited to evidence of specific enumerated and limited aggravating factors. Factor (k), permitting evidence of "extenuating circumstances," was not intended to apply to aggravating circumstances. Thus, the prosecution was restricted to presenting evidence of any listed factor exclusive of factor (k), although on rebuttal following defendant's presentation of factor (k) evidence, it could introduce evidence "tending to 'disprove any disputed fact that is of consequence to the determination of the action.' (Evid. Code, § 210.)" (*Id.* at p. 776.)

Defendant contends that the court's failure here to give the requested limiting instruction in conjunction with two additional circumstances made it more likely that the jury improperly considered nonstatutory aggravating factors. First, he points out the court's statement before reading the list of aggravating and mitigating factors enumerated in section 190.3: "In determining which penalty is to be imposed on defendant, you shall consider all of the evidence which has been received during any part of the trial of this case, except as you may be hereafter instructed." Defendant asserts that the only exception described for the jury was the admonition that the absence of a factor in mitigation does not constitute aggravation. Thus, defendant asserts, the jury probably went astray in considering the evidence described hereafter because it had been told to consider "all the evidence."

The second exacerbating factor which defendant cites occurred during the court's reading of the modified CALJIC No. 8.84.2. The court recited "After having heard all the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account, and be guided by the applicable *factors of aggravation* and—aggravating and mitigating circumstances upon which you have been instructed." (Italics added.) Conceding that the insertion of the emphasized phrase which did not appear in the written instruction was probably due to the court's misspeaking itself, defendant nonetheless contends that the repetition may have indicated to the jury that there were both delineated *factors* in aggravation and unspecified *circumstances* in aggravation which the jury was free to consider. We find this argument to be without merit. The court was simply correcting a misstatement in which it began by using "aggravation" as a

noun and switched to the use of the adjective "aggravating" in order to achieve grammatical consistency and to adhere to the agreed-upon written instructions. Heightening a slip of the tongue of this nature to an error relied upon by the jury would be an exercise in trivialization.

Before returning to the merits of the balance of defendant's argument, we first consider what evidence he argues may have been improperly considered by the jury. Defendant cites as potentially improper evidence considered as aggravating circumstances "such things as his cohabitation with more than one woman at a time, his fathering a child with a woman to whom he was not married, his carrying of a gun, and the time he spent in jail." Defendant points to no instance in which the prosecutor during closing argument relied on any evidence which did not fall under the aggravating factors described in section 190.3's list of circumstances for the jury's consideration. The information was merely presented as background evidence to place the testimony of various witnesses in context.

In reviewing the instructions that would be given to the jury, the prosecutor referred to the instruction which would list the enumerated factors. He explained that "it lists those items—it says things that you can consider in aggravation. *And you are kind of limited. You are limited to those factors that you can consider in aggravation.*" (Italics added.) As to factor (k) specifically, the prosecutor stated that it involved "whatever other circumstance you can think of or can consider or bring up, any other circumstance which extenuates the gravity of the crime, even though it's not a legal excuse for the crime. [¶] *That is to the Defendant's advantage. He's not limited. You can bring in the whole world.*" (Italics added.)

In describing the aggravating factors which the prosecution had presented to the jury, counsel described them as "the things of violence and terror that this man has brought into the lives of others." At one point the prosecutor listed various incidents which the evidence had revealed for the jury's consideration. He limited himself to acts of violence which the various witnesses had described *and made no reference to evidence of the nature described by defendant in his argument here.* In summary, at no point did the prosecutor argue that the jury should consider any evidence which did not fall under one of the enumerated aggravating factors in section 190.3, and with regard to factor (k) he specifically informed the jury that its terms were for defendant's benefit alone.

In view of (1) the lack of objection to the evidence presented; (2) the nature of the evidence (which was not clearly "aggravating"); (3) the prosecution's proper explanation of the scope of aggravating and mitigating factors which the jury could consider; and (4) the lack of any use of the

cited material in the prosecutor's closing argument, we believe that even if the directives in *Boyd* are retroactively applicable here—an issue we do not decide—there was no *Boyd* error.

■ Defendant also asserts that the court erred in not giving the second portion of his proposed instructions. He argues that the instructions which were given did not inform the jury that it could consider evidence in mitigation beyond that which related directly to the crime. Defendant's claim that he was entitled to have specific factors in mitigation enumerated in an instruction, is based on our decisions in *People* v. *Rincon-Pineda* (1975) 14 Cal.3d 864 [123 Cal.Rptr. 119, 538 P.2d 247, 92 A.L.R.3d 845], and *People* v. *Sears* (1970) 2 Cal.3d 180 [84 Cal.Rptr. 711, 465 P.2d 847], and the United States Supreme Court decision in *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 989-990, 98 S.Ct. 2954].

In *Rincon-Pineda,* we held that the cautionary instruction given regarding the testimony of the victim in rape cases should no longer be used. We observed that general instructions could sufficiently "focus the jury's attention on the cruciality of the testimony of a particular witness . . . ." (14 Cal.3d at p. 885.) In addition, noting that we had held in *Sears* that a "defendant is entitled to an instruction 'relating particular facts to any legal issue,'" we stated "[s]uch a requested instruction may, in appropriate circumstances, relate the reasonable doubt standard for proof of guilt to the particular elements of the crime charged . . . or may 'pinpoint' the crux of a defendant's case, such as mistaken identification or alibi [citations]." (*Ibid.*)

Defendant's proposed instruction did more than the instructions described in *Rincon-Pineda*. It specifically singled out only a partial list of potential mitigating factors for the jury's consideration. Given the jurors' duty to weigh all the relevant and proper material, this emphasis on certain items as proposed in the instruction would arguably have redounded to defendant's detriment by indicating to the jury that it was *restricted* in its consideration of mitigating factors to the specifically enumerated factors in section 190.3 and the particular items mentioned in the instruction. Moreover, the suggested instruction arbitrarily stressed certain items of evidence. As the attorney general notes, it raised the question of whether the prosecutor could have asked for a listing of aggravating evidence in order to balance the instruction. Most importantly, the instruction did not assist the jury in comprehending the legal "crux" of defendant's case as was the situation discussed in *Rincon-Pineda*. Rather, it merely highlighted certain factual matters without further illuminating the legal standards at issue.

Nor is *Lockett* v. *Ohio, supra,* 438 U.S. 586, of assistance. Undoubtedly, under that decision a defendant may present for jury consideration, "*as a*

*mitigating factor,* any aspect of a defendant's character or record and any circumstance of the offense that the defendant proffers as a basis for a sentence less than death." (*Id.* at p. 604, fn. omitted [57 L.Ed.2d at p. 990].) Nonetheless, *Lockett's* focus was on assuring that the sentencer not be *precluded* from considering in mitigation any evidence relating to the defendant's record or character. (*Ibid.*) It imposed no requirement that a trier of fact be instructed in the manner suggested here. Moreover, such an instruction might well have flown in the face of *Lockett's* injunction to the extent that it may have been interpreted by the jury as *limiting* its consideration of mitigating factors. Finally, as we have noted above, the instructions and argument in his case properly informed the jury of the scope of factors which it could appropriately consider in reaching a penalty verdict.

(e) *Instructing the jury to reach a just verdict "regardless of what the consequences may be."* ██ Defendant asserts that the court's instruction, stating "Both the People and the defendant have a right to expect that you will conscientiously consider and weigh the evidence and apply the law of the case, and that you will reach a just verdict regardless of what the consequences of such verdict may be," was improper. In *People* v. *Brown, supra,* 40 Cal.3d 512, we considered such a claim raised in conjunction with the assertion that the first part of CALJIC No. 1.00 requiring the jury to ignore sympathy, was error. We observed that "at the *penalty* phase of a capital trial, the 'consequences'—the choice between the two most extreme punishments the law exacts—are precisely the issue the jury must decide. In this context, an instruction to ignore 'consequences' can be understood by the jury in the same light as an admonition to disregard sympathy. We agree that this portion of CALJIC No. 1.00 should never be given in a capital penalty trial." (*Id.* at p. 537, fn. 7.)

The *Brown* jury was affirmatively instructed to ignore sympathy. In the present case, of course, an instruction expressly informing the jury that it could consider "pity" was given. In light of that specific admonition, the concern for misleading the jury expressed in *Brown* was not invoked here and we need not examine the record further to assure the jury was aware of its proper sentencing responsibilities.

6. *Constitutionality of the 1978 Statute.*

The charged murder occurred May 30, 1981. This case therefore is governed by the so-called Briggs death penalty initiative, adopted by the voters in November 1978 to replace the Legislature's 1977 death penalty statute. As explained in *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777 [230 Cal.Rptr. 667, 726 P.2d 113], under both versions of sections 190.1 and 190.2, a defendant is eligible for the death penalty only if the jury initially

convicts him of first degree murder and in addition finds one or more "special circumstances" to be true. If both occur, a separate penalty trial ensues at which the sentencer must consider enumerated "aggravating and mitigating circumstances" in selecting the appropriate penalty. (Current and former § 190.3.) The 1978 version additionally provides that the sentencer "shall" impose the death penalty once it ascertains that aggravating circumstances "outweigh" mitigating and "shall" impose life without parole if it determines that mitigating circumstances "outweigh" aggravating. (Current § 190.3.)

■ Defendant argues that the capital sentencing statute is unconstitutional because it fails to meet the minimum standards required by the United States Supreme Court in order to assure that the death penalty is rationally and consistently applied. Specifically, defendant asserts that the statute is deficient because it fails to provide for (1) specific objective enumeration of aggravating and mitigating factors for the jury's guidance, (2) exclusion of nonstatutory, unspecified aggravating factors as the basis for the death penalty, (3) a requirement that written findings be provided for any aggravating factors which are found true, (4) a requirement that the existence of any aggravating factors be proved beyond a reasonable doubt, (5) a requirement that the penalty jury be unanimous before any aggravating factor may be found, and (6) a provision for appellate review to assess proportionality of punishment.

Most of these challenges were rejected as to the 1978 law in *People* v. *Rodriguez, supra,* 42 Cal.3d at pages 777-779. As to defendant's claims regarding exclusion of nonstatutory aggravating factors, as we have previously discussed (see *ante,* at pp. 438, 442), this court has already held that the prosecution is limited to relying on evidence of any listed factor exclusive of factor (k). (See *People* v. *Boyd, supra,* 38 Cal.3d at pp. 772-776.) In this case, moreover, as we explained, the prosecutor made no reference to evidence of nonenumerated factors which defendant asserts was improperly introduced, and in fact informed the jury that its consideration was limited to those aggravating factors listed in section 190.3. Our review demonstrated that there was no suggestion to the jury that it could consider any factors in aggravation other than those specifically enumerated and in fact that its consideration was limited in the manner defendant urges as appropriate.

In sum, we conclude that the 1978 statute is not invalid on the grounds cited by defendant and discussed above.

7. *Disproportionality of Sentence.*

■ We consider separately defendant's contention that this court should undertake proportionality review on both an intra- and intercase

basis. His former claim is based on the fact that Joy Stevens, charged as an accessory to the murder for unlawfully harboring, concealing and aiding defendant and Lemock, was permitted to plead guilty with the promise that she would receive probation and no more than a year's time in county jail as a condition thereof, while Lemock was completely acquitted. He relies on *In re Lynch* (1972) 8 Cal.3d 410, 424 [105 Cal.Rptr. 217, 503 P.2d 921], for the proposition that a punishment may violate article I, section 17 of the California Constitution if, "although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (Fn. omitted.)

Defendant focuses on the first factor discussed in *Lynch* as relevant to a proportionality determination, namely consideration of the nature of the offense and offender and consideration of the degree of danger to society. (8 Cal.3d at pp. 425-426.) In this regard, defendant refers to the analysis undertaken in *People* v. *Dillon* (1983) 34 Cal.3d 441, 479-489 [194 Cal.Rptr. 390, 668 P.2d 697]. Dillon, a 17-year-old student, joined 6 classmates in an attempt to steal marijuana from a nearby grower. Hearing shots actually set off by a compatriot, defendant believed that his friends may have been shot. When approached by a man guarding the marijuana who was carrying a shotgun, defendant believed that a shift in the man's weapon meant that he was about to be fired upon and he responded by pulling the trigger on his gun. After his conviction for first degree felony murder, the defendant was sentenced to life imprisonment when it was "unexpectedly" held that he was ineligible for Youth Authority commitment. Commenting on defendant's youth and immaturity as well as on indications that both judge and jury believed a sentence of life imprisonment was inappropriate, we stressed the fact that "petty chastisements" were handed out to Dillon's companions. We noted several of them were armed, all were coconspirators, and "At the very least they were aiders and abettors and hence principals in the commission of both the attempted robbery and the killing of Johnson." (*Id.* at p. 488.) We therefore found that application of the penalty for first degree felony murder was inappropriate under all the circumstances, including the defendant's individual culpability.

In contrast here, Stevens, although initially charged with murder and as an accessory after the fact, was held responsible only for her acts *after* the murder. She was never armed and the evidence, contrary to defendant's contention, does not show that she was an active participant in a conspiracy to murder. To compare *Dillon* with Lemock's situation following his acquittal would be to compare apples with oranges. Quite simply, Lemock was acquitted.

As reiterated throughout this opinion, defendant's culpability was *not* dependent upon Lemock's. That Lemock is free today is not the result of disproportionate sentencing of two individuals *found guilty* of a crime. (Cf. *People* v. *Allen, supra,* 42 Cal.3d 1222 at pp. 1285-1286.)

██ Defendant also makes a separate request that this court undertake intercase proportionality review. As discussed above, any challenge under federal law is of course controlled by *Pulley* v. *Harris* (1984) 465 U.S. 37, 51-53 [79 L.Ed.2d 29, 40-42, 104 S.Ct. 871], in which the United States Supreme Court found our 1977 law was not invalid because it did not provide for proportionality review. Defendant points to no specific factors in the 1978 law that would indicate a different result should be reached as to it. We, therefore, find no basis for reversal in defendant's proportionality claims.

## V. CONCLUSION

The trial court and counsel in this case did an excellent job of anticipating several of our decisions. By additional instructions and proper argument the jury was given an adequate and accurate description of its role in determining penalty. Any errors which occurred were insubstantial; none, under any standard, requires reversal.

The judgment of guilt and the judgment imposing the death penalty are affirmed.

Mosk, J., Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

**BROUSSARD, J.,** Concurring and Dissenting.—I concur in the majority opinion except for its discussion of the special circumstance of intentional murder for financial gain. In *People* v. *Bigelow* (1984) 37 Cal.3d 731 [209 Cal.Rptr. 328, 691 P.2d 994], we observed that this special circumstance, if read broadly, would overlap other special circumstances such as murder in the course of robbery or burglary. We noted that courts of three other states had adopted restrictive constructions of "murder for pecuniary gain" in order to avoid duplicative aggravating factors. We then concluded that "the court should construe special circumstance provisions to minimize those cases in which multiple circumstances will apply to the same conduct, thereby reducing the risk that multiple findings on special circumstances will prejudice the defendant. Such a limiting construction will not prejudice the prosecution, since there will remain at least one special circumstance— either financial gain or felony murder—applicable in virtually all cases in which the defendant killed to obtain money or other property. We adopt a

limiting construction under which the financial gain special circumstance applies only when the victim's death is the consideration for, or an essential prerequisite to, the financial gain sought by the defendant." (*Id.* at p. 751.)

The majority opinion limits *Bigelow, supra,* 37 Cal.3d 731, in a rather unusual and undesirable fashion. It states that *"Bigelow's* formulation should be viewed strictly when it is important to serve the purposes underlying that decision, but that it is not intended to restrict construction of 'for financial gain' when overlap is *not* a concern." (Maj. opn., *ante,* at p. 410.) Thus *Howard* gives a dual meaning to the phrase "for financial gain." When the prosecutor charges both felony murder and murder for financial gain, the phrase would *mean* a murder in which the victim's death is essential to the gain, but whenever he charges only murder for financial gain, the same words would *mean* something different, broader, and wholly undefined. While one can argue about what the people intended when they enacted a special circumstance of murder for financial gain, it is quite unlikely that they intended two different things depending on whether the prosecutor chose to join a charge of felony murder.

We do not need to reexamine *Bigelow's* definition of murder for financial gain in this case, since any error in failing to give a *Bigelow* instruction here was clearly harmless. The prosecutor claimed that defendant killed Berkey to obtain payment pursuant to a contract with Lemock, which if true would mean that the victim's death was the consideration for financial gain under *Bigelow, supra,* 37 Cal.3d 731. Defense counsel argued that defendant killed as a favor to Lemock, not for financial gain. There was no evidence or argument that defendant killed for some kind of financial gain that does not come within the *Bigelow* definition. Thus the case went to the jury on the question whether defendant killed pursuant to contract, or for nonfinancial reasons. The jury's verdict determined that defendant was a hired killer, which makes him guilty of murder for financial gain within the *Bigelow* construction.

In sum, I see no reason for this court to consider adopting a construction of the financial-gain special circumstance under which its meaning varies from case to case depending on the charges filed. Defendant's contention was that the court erred in not instructing in accord with our decision in *Bigelow.* The error, if any, was not prejudicial. That should be sufficient to decide the issue.

Appellant's petition for a rehearing was denied April 21, 1988, and the opinion was modified to read as printed above.